# United States Court of Appeals

## For the First Circuit

No. 05-1315

UNITED STATES OF AMERICA,

Appellee,

v.

KURT ROBERSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lipez, Circuit Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

Martin F. Murphy, with whom Foley Hoag LLP was on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

August 11, 2006

**HOWARD**, **Circuit Judge**.  A jury convicted Kurt Roberson of selling more than 50 grams of crack cocaine, see 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)(iii), and of using or carrying a firearm during and in relation to that transaction, see 18 U.S.C. § 924(c)(1)(A).  The district court sentenced Roberson to 300 months' imprisonment.  Roberson's appeal challenges his convictions and sentence on several grounds.  We affirm.

## I.

The Federal Bureau of Investigation (FBI) began investigating Roberson in early 2003.  As part of that investigation, FBI agents engaged the services of a cooperating witness, Eric Mena, who had known Roberson for eight years and had formerly been a drug dealing associate of Roberson's.  Mena agreed to make a controlled purchase of crack cocaine from Roberson as part of a plea bargain resolving drug charges against him.

On March 10 of that year, FBI agent Edward Kappler outfitted Mena with an electronic transmitter and a digital recorder to enable the FBI to monitor Mena's conversations with Roberson.  Mena then went to the home of Raymond Muse, a mutual associate of Roberson and Mena, and informed him that he wanted to buy some crack from Roberson.  Muse brought Mena to where Roberson was currently staying.  After Roberson entered Mena's car, Mena told him that he needed two ounces of crack.  Roberson agreed to provide the drugs the next evening and told Mena that he should call to initiate the pickup.

While Mena was saving Roberson's phone number on his mobile phone, Roberson spontaneously stated, "Yo, you got any burners?  I can trade you a burner."  Mena testified at trial that "burner" meant handgun, and that he understood Roberson's statement to be an offer to sell him a gun.  Roberson described the gun as "a brand new, 40 cal." that was "like a Glock, top is chrome.  The rest is plastic."  Mena was noncommittal as to that offer but confirmed that he would meet with Roberson the next day.

The following evening, Mena, who was again outfitted with a transmitter and an audio recorder, tried several times, unsuccessfully, to reach Roberson on his mobile phone.  The FBI directed Mena to drive to Muse's house again.  Rather than using his own car, however, Mena drove an undercover car that the FBI had equipped with a hidden video camera.  After Muse and Mena successfully contacted Roberson, Muse directed Mena to an apartment complex in a nearby town.  Mena drove the undercover car with Muse as his passenger.

After they arrived at the apartment complex, Muse located Roberson and brought him to Mena's car.  Roberson sat in the front passenger seat next to Mena, while Muse sat in the back.  Roberson told Mena, "I got your sixty grams," and then told him it would cost $2,000.  As Mena was counting out his money, Roberson looked out the back window and stated, "I got the rap on me so I'm shook anyway."  Mena testified at trial that this meant that Roberson was paranoid because he had a handgun on him.  Roberson then handed Mena a sandwich bag containing crack.

As Mena inspected the crack, Roberson pulled a handgun out of his waistband, pointed it in Mena's direction, and stated, "That's what I'm talking about man." Mena told Roberson not to point the gun at him and asked to see it. Roberson handed the gun to Mena, who looked at it and smelled it to see if it had been fired. Mena found the design of the gun to be consistent with a "Glock" in that the top was chrome and the bottom was plastic. Mena asked Roberson why he wanted to get rid of the handgun and Roberson replied that the serial numbers had been scratched off. When Mena asked whether the gun had been fired yet, Roberson replied, "Nah, I don't waste shells, man. I shoot niggas though." Mena handed the gun back to Roberson, and they completed the drug transaction.

Mena then asked Roberson if he would be interested in buying Mena's car. Mena initiated this conversation outside the car so that FBI agents would have an opportunity to observe Roberson directly. As a result, agent Timothy Quinn, who was conducting physical and audio surveillance nearby, was able to drive within 12 feet of Mena and Roberson as they looked over the vehicle. Roberson then went back into the apartment complex.

Later that month, a federal grand jury returned a two count indictment charging Roberson of possession with intent to distribute and distribution of more than 50 grams of cocaine base,[1]

---

[1]The term "cocaine base," includes, inter alia, "crack cocaine." United States v. Anderson, --- F.3d ---, No. 05-1872, 2006 WL 1766704, at *20 (1st Cir. June 29, 2006).

in violation of the Controlled Substances Act ("CSA"), see 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)(iii) (the "drug charge"), and of using or carrying a firearm "during and in relation to" a drug trafficking offense, see 18 U.S.C. § 924(c)(1)(A) (the "gun charge"). The government subsequently filed an information pursuant to 21 U.S.C. § 851 providing notice of its intent to seek increased punishment -- the doubling of the drug charge's mandatory minimum sentence from 10 to 20 years -- by reason of a prior conviction. After a five-day trial, including testimony from Mena, Kappler and Quinn, a jury convicted Roberson on both counts.

Roberson moved for a judgment of acquittal both during trial and after the verdict. See Fed. R. Crim. P. 29(a), (c). He argued that there was insufficient evidence establishing that he had possessed crack or had sold more than 50 grams of crack. He also argued that the government had not presented sufficient evidence to prove that he had carried or used a "firearm," as that term is defined in 18 U.S.C. § 921(a)(3), or that he had carried or used a firearm "during and in relation to" the drug transaction. Finally, he argued that, because the government had not offered any evidence establishing his prior conviction, the district court could not impose an increased penalty for the drug conviction. The court denied Roberson's motions in all respects.

At sentencing, the district court found that the 20-year mandatory minimum applied to the drug charge, see 21 U.S.C. § 841(b)(A)(iii), and a 5-year consecutive mandatory minimum applied to the gun charge, see 18 U.S.C. § 924(c)(1)(A). After determining

that the Sentencing Guidelines advised a sentencing range of 35 years to life, and considering the sentencing factors set forth in 18 U.S.C. § 3553(a), the court imposed a sentence of 25 years in prison, the statutory minimum sentence.

Roberson now appeals the district court's order denying his motion for judgment of acquittal on the gun charge, arguing that the government failed to adduce sufficient evidence to prove either that he carried an actual "firearm" or that he carried a firearm "in relation to" a drug trafficking offense. He alternatively requests a new trial on the gun charge on the ground that the court erroneously instructed the jury concerning the "in relation to" requirement, and a new trial on both charges on the basis of improperly admitted testimony. Finally, Roberson argues that the applicable mandatory minimum sentence for the drug conviction is ten years, not 20 years.

## II.

### A.    The gun charge

Roberson challenges the consecutive five-year mandatory minimum sentence he received for using or carrying a firearm "during and in relation to a drug trafficking offense" on several grounds. 18 U.S.C. § 924(c)(1)(A). We begin with Roberson's contention that the district court incorrectly instructed on the "in relation to" requirement, and compounded the error by simply restating the same erroneous instruction when the jury sought clarification.

At trial, both Roberson and the government submitted proposed jury instructions addressing the gun charge. The government proposed the First Circuit pattern jury instruction, which provides, in relevant part:

> To "carry" a firearm during and in relation to a crime means to move or transport the firearm on one's person or in a vehicle or container during and in relation to the crime. It need not be immediately accessible. To "use" a firearm during and in relation to a crime means to employ the firearm actively, such as to brandish, display, barter, strike with, fire or attempt to fire it, or even to refer to it in a way calculated to affect the underlying crime. The firearm must have played a role in the crime or must have been intended by the defendant to play a role in the crime. That need not have been its sole purpose, however.

See First Circuit Criminal Pattern Jury Instructions § 4.07 (1998). The pattern instruction purposefully declines to define "in relation to" separately from the terms "carry" and "use." See id. § 4.07 cmt. 3 ("It seems best not to define 'use or carry' separately from 'during and in relation to.'").[2] Roberson, however, drawing on language from Smith v. United States, 508 U.S. 223 (1993), proposed that a paragraph be added to directly address this requirement. The court agreed to instruct the jury on the "in relation to" element, but declined to adopt Roberson's proposal

---

[2]Although Roberson does not challenge the pattern instruction itself, we pause to note that the pattern instructions are not mandatory nor has this court approved the use of any particular instruction. See United States v. Tse, 375 F.3d 148, 157-58 (1st Cir. 2004).

-7-

wholesale. Instead, it crafted its own instruction based on language from Smith:

> The words "during and in relation to" are to be given their plain and customary meaning. The phrase "in relation to" is expansive. At a minimum it means that the firearm must have had some purpose or effect with respect to the drug trafficking crime. If a firearm is present simply as a result of coincidence or accident it cannot be said that it was used or carried in relation to the drug traffic[king] offense. The firearm must have facilitated or have had the potential to facilitate the drug offense.

During a pre-charge conference, Roberson objected to the statement "the phrase 'in relation to' is expansive." He argued that the word "expansive" erroneously implied that the phrase "in relation to" was intended to expand, rather than limit, the phrase "used or carried." The district court denied the objection and delivered the pattern jury instruction along with the "in relation to" insert that it had crafted. After the charge, Roberson failed to renew his objection, and the jury retired to deliberate.

During the first full day of deliberations, the jury submitted a note asking: "Does carrying a firearm during but independent of a drug transaction constitute the use of a firearm in relation to drug trafficking?" Contending that the word "independent" means the opposite of "in relation to," Roberson requested the court to directly answer the jury's question in the negative. The court, however, agreed with the government that such an instruction would risk providing the jury with a decisive conclusion. The court therefore elected to simply re-read the gun

-8-

charge instruction in the hope that hearing the instruction again would help the jury resolve the question internally. Before the court summoned the jury, Roberson again objected that the instruction was erroneous insofar as it stated that "in relation to" is "expansive." After the re-reading of the instruction, the jury returned its verdicts later that day without additional inquiry.

To preserve an objection to a jury instruction under Fed. R. Crim. P. 30(d), a litigant must lodge a specific objection and state the grounds for the objection <u>after</u> the court has charged the jury and before the jury begins deliberations. <u>See</u> <u>United States v. Moran</u>, 393 F.3d 1, 13 & n.7 (1st Cir. 2004). Objections registered during pre-charge hearings are insufficient to preserve the issue. <u>See</u> <u>id</u>. We review such unpreserved jury instruction claims for plain error only. <u>See</u> <u>id.</u>

Roberson seeks a more favorable standard of review by arguing that his second objection to the "expansive" instruction preserved the issue because it was made <u>after</u> the court's original charge to the jury on the gun charge and <u>before</u> the jury retired to deliberate following the court's re-reading of the gun charge instruction. Roberson contends that the second objection effectively served Rule 30(d)'s purpose "to bring to the attention of the trial court errors or omissions in its charge so that they may be corrected before the case goes to the jury." <u>United States v. Sturm</u>, 870 F.2d 769, 775-76 (1st Cir. 1989). But the <u>case</u> had already gone to the jury. Roberson's renewed objection, registered

-9-

after the jury had begun its deliberations, came too late to satisfy Rule 30(d). See United States v. Santana-Rosa, 132 F.3d 860, 863 n.1 (1st Cir. 1998) ("[A] party waives any objection it might have to a jury instruction by failing to enter that objection into the record immediately after the judge has instructed the jury and before the jury begins deliberations.") (Emphasis added).[3] We therefore review the instruction for plain error, under which Roberson "must demonstrate: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Moran, 393 F.3d at 13 (quotation marks omitted).

Roberson cannot meet this stringent standard. The district court took the language "[t]he phrase 'in relation to' is expansive" directly from the majority opinion in Smith. See 508 U.S. at 237. Roberson makes no argument that Smith is no longer good law or has been undermined by subsequent Supreme Court precedent. Indeed, federal appellate courts continue to cite Smith for the proposition that "in relation to" is "expansive." See, e.g., United States v. Brown, 400 F.3d 1242, 1250 (10th Cir. 2005); United States v. Williams, 344 F.3d 365, 371 (3d Cir. 2003); McNeal v. United States, 249 F.3d 747, 750 (8th Cir. 2001).

_____

[3]Even were we to accept the premise that the re-reading of an instruction could present a fresh opportunity for a litigant to object to the instruction, we note that Roberson again failed to lodge the objection after the court re-read the charge to the jury.

Moreover, Roberson's argument that the jury likely misunderstood "expansive" to mean that the phrase "in relation to" was intended to enlarge upon the circumstances in which a defendant may be prosecuted for using or carrying a firearm, is belied when the instruction is viewed as a whole. See United States v. DeStefano, 59 F.3d 1, 3 (1st Cir. 1995). Although one definition of "expansive" is "capable of expanding or tending to expand," The Am. Heritage Dictionary 624 (4th ed. 2000), another is "broad in size or extent; comprehensive." Id. Only the latter definition makes sense in the context of the instruction as a whole. The sentences immediately following the "expansive" instruction state:

> At a minimum ["in relation to"] means that the firearm must have had some purpose or effect with respect to the drug trafficking crime. If a firearm is present simply as a result of coincidence or accident it cannot be said that it was used or carried in relation to the drug traffic[king] offense. The firearm must have facilitated or have had the potential to facilitate the drug offense.

Given the limiting language of those sentences, it would be illogical to read the sentence containing the word "expansive" in the way Roberson suggests. When read in its entirety, the "in relation to" instruction adequately and accurately conveys the meaning of the phrase as described in Smith.

Roberson counters that the jury's mid-deliberation question illustrates that there was confusion with the instruction. He argues that the district court therefore erred by not directly answering the jury's question as he suggested: that "if it is their conclusion that the gun was either used or carried independent of

-11-

the drug trafficking offense, that would mean that it was not either used or carried in relation to the drug trafficking crime."

We disagree. As a general rule, whether to provide a supplementary instruction to the jury "is a matter within the sound discretion of the trial court." Elliot v. S.D. Warren Co., 134 F.3d 1, 7 (1st Cir. 1998). Here, the court anticipated that the jury might wrestle with the issue of whether the gun was used or carried "in relation to" the drug transaction. At Roberson's behest, the court carefully crafted an instruction, consistent with Smith, to aid the jury's evaluation of the "in relation to" requirement. Under the circumstances, it was well within the court's discretion to eschew "elaborat[ing] on these initial, entirely correct instructions" and instead, elect simply "to refer the jury to the original formulation." Id.

This is especially so given the phrasing of the jury question, which suggested that the jury was putting it to the court to make the dispositive decision. District courts must exercise caution in such circumstances. See e.g., Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003) (recognizing in a similar situation that a district court must exercise caution, when a "simple affirmative or negative response might favor one party's position, place undue weight on certain evidence, or indicate that the trial judge believes certain facts to be true when such matters should properly be determined by the jury") (quotation and emphasis omitted); United States v. Lakich, 23 F.3d 1203, 1209 (7th Cir. 1994) (noting that a district court "would have risked intruding on

-12-

the jury's fact finding" had it given "a simple affirmative answer" to the jury's question of whether a finding of entrapment on one count "reflects" on another). We therefore cannot fault the court for choosing the more cautious alternative of re-reading the original instruction and letting that instruction stand alone.[4]

Roberson also challenges the sufficiency of the evidence supporting the gun charge. "In determining the evidentiary sufficiency of a guilty verdict, we review the totality of the evidence in the light most favorable to the government, and then ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Bailey, 405 F.3d 102, 111 (1st Cir. 2005) (quotation marks omitted).

Roberson first challenges the government's evidence establishing that he used or carried a "firearm" during the drug transaction.[5] See United States v. Taylor, 54 F.3d 967, 975 (1st

---

[4]We reject Roberson's suggestion that United States v. Bollenbach, 326 U.S. 607 (1946), required the district court to respond to the jury's question with an explicit answer. In Bollenbach, the Supreme Court found that the trial court had erred by responding to a jury question with an erroneous supplemental instruction. Id. at 612-13. That is precisely the pitfall the district court endeavored to avoid in this case. See United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001) ("[W]e have recognized that, in some instances, attempts to clarify inherently nebulous concepts can do more harm than good.").

[5]Under 18 U.S.C. § 921(a)(3), a "firearm" is defined as:

> (A) any weapon (including a starter gun) which will or is designed or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive

-13-

Cir. 1995) (noting that 18 U.S.C. § 924(c) "requires proof beyond a reasonable doubt that the person perpetrating the predicate offense used a real gun").  He contends that Mena's testimony by itself is insufficient to prove that the object Roberson handed to Mena was a real gun because Mena is not an expert on guns and his lay opinion is not creditworthy, given that it is based on his observation of the alleged gun at night in a dark car.

Although § 924(c) requires proof that the gun is real, the government's proof need not "reach a level of scientific certainty." Id. at 975-76.  Descriptive lay opinion testimony can be sufficient. United States v. Kirvan, 997 F.2d 963, 966-67 (1st Cir. 1993).  Here, Mena's testimony was sufficient to ground the jury's finding.  Although Mena was not a firearms expert, he testified that he was familiar with handguns, having held them on several occasions.  Mena testified that he had the opportunity to hold and closely inspect Roberson's handgun.  Mena took advantage of that opportunity, smelling it to see if it had been fired, and noticing that the serial numbers had been scratched off.  At trial, Mena provided details about the gun (that it looked new and had chrome on the top with a black plastic bottom), noted that its design (a plastic bottom) was commonly referred to by his associates in the drug trade as a "Glock," and stated that it "felt like a handgun."  Although Mena observed the gun at night inside a car with the interior lights off, such factors go only to the

device.  Such term does not include an antique firearm.

weight of Mena's testimony, and would not prevent a rational jury from crediting Mena's opinion. Cf. Taylor, 54 F.3d at 976 (finding sufficient lay witness testimony by a bank teller and a customer service representative who "observed the object gripped by [the defendant] at close range"); Kirvan, 997 F.2d at 966-67 (finding sufficient lay witness testimony of two individuals who described seeing the defendant holding what appeared to be a gun, and who stated that it sounded "heavy" when it fell to the ground).

Roberson also contends that a rational jury could not have found that Roberson used or carried the gun "in relation to" a drug trafficking offense because the evidence established, at most, that he carried the gun for the independent purpose of offering it to Mena after completion of the drug transaction. He asserts that his offer to sell the gun to Mena was an entirely separate and unrelated transaction.

As the jury was instructed, the "in relation to" language of § 924(c)(1) requires, at a minimum, that the firearm have some purpose or effect with respect to the drug trafficking crime. Smith, 508 U.S. at 238. Mere possession of a gun during the course of criminal conduct does not support a conviction under the statute. United States v. Plummer, 964 F.2d 1251, 1254 (1st Cir. 1992); see also United States v. Grace, 367 F.3d 29, 35 (1st Cir. 2004). Nonetheless, the phrase has been construed broadly, and encompasses a variety of situations where the firearm facilitates or has the potential to facilitate the drug trafficking offense. See, e.g., Smith, 508 U.S. at 229 (finding that an attempt to

-15-

barter a firearm for drugs satisfied the "in relation to" requirement); United States v. Luciano-Mosquera, 63 F.3d 1142, 1151 (1st Cir. 1995) (holding that gun kept available "if a contingency arose or to make [an] escape" was carried "in relation to" the predicate drug offense). Moreover, facilitation of the underlying drug offense need not be the defendant's sole purpose for possessing the weapon. See United States v. Vazquez Guadelupe, 407 F.3d 492, 500 n.4 (1st Cir. 2005) (noting that a sufficient nexus existed between defendant's possession of a gun and the drug crime notwithstanding a legitimate explanation for defendant's possession of the gun -- viz., his employment as a police officer).

Here, at least two permissible grounds existed for the jury's determination that Roberson used or carried the firearm "in relation to" the drug transaction. The jury could have reasoned that Roberson brandished the gun to embolden himself or to intimidate Mena. See United States v. Eaton, 890 F.2d 511, 512 (1st Cir. 1989). At their first meeting, Roberson informed Mena that he had a handgun to trade. A rational jury could infer that Roberson intended that statement to put Mena on notice that he would be armed on the day of the drug transaction. Sure enough, during the transaction, before Mena finished paying for the crack, Roberson pulled the handgun from his waistband, pointed it in Mena's direction, and proclaimed, "that's what I'm talking about." Further demonstrating his deadly potential, Roberson informed Mena that, while he does not "waste shells," he does "shoot niggas." Although the evidence that Roberson subsequently handed the gun to

Mena may weaken the theory that Roberson was using the gun to intimidate Mena, the above evidence was sufficient to ground the jury's verdict.  See Plummer, 964 F.2d at 1255 (noting that while the facts may permit multiple inferences, "the factfinder is entitled to choose among reasonable interpretations of the evidence").

Even if the jury believed that the gun was carried only for the purpose of attempting to sell it to Mena, it still could have reasonably concluded that the gun was carried "in relation to" the drug transaction.  At the first meeting, when Mena asked Roberson for crack, Roberson mentioned that he had a gun he wanted to trade.  The next day, as Mena was counting his money, Roberson handed the gun to Mena for his inspection and stated that he was nervous about carrying the gun because the serial numbers were scratched off.  Indeed, it appeared to Mena that Roberson was anxious to get rid of the gun.  From this testimony, the jury could have reasonably concluded that the opportunity to trade the gun was an incentive for Roberson to agree to Mena's request for crack.  Cf. United States v. Lipford, 203 F.3d 259, 267 (4th Cir. 2000) (holding that in order to convince a seller to take the risks inherent in the sale of drugs, "a drug purchaser can often 'sweeten the pot,' offering to purchase not only drugs, but other illegal goods as well").  On these facts, a jury could have reasonably concluded that, at least in Roberson's mind, the gun deal and the drug deal were intertwined.

**B.    Improper testimony**

During its case-in-chief, the government asked Mena whether he knew "which is more addictive, crack or cocaine powder?" The district court overruled Roberson's subsequent objection, and Mena answered, "I believe crack is more addictive." When asked which drug is "stronger," Mena again answered, "crack." Mena then testified that when he had been a drug dealer, he had sold powder cocaine, but that Roberson had been a crack dealer. During its closing argument, the government stated, "Eric Mena told you that he was a cocaine dealer and that Kurt Roberson was a crack dealer. Eric Mena also told you that as between cocaine and crack, crack is more potent and addictive."

On appeal, Roberson contends that the government failed to lay a sufficient foundation to ground Mena's opinion because it did not establish that Mena was an expert on the addictive properties of cocaine, see Fed. R. Evid. 702, or offer evidence about Mena's lay perceptions as to the different addictive qualities or relative potency of crack versus powder cocaine, see Fed. R. Evid. 701. Roberson contends that the improperly admitted evidence was both misleading (in that it is the difference in the typical method of administration, not any difference in the inherent properties of the two forms of cocaine, that causes an increased risk of addiction with crack)[6] and highly prejudicial (in that the improper testimony and closing argument was aimed at

_____
[6]See United States Sentencing Commission Report to Congress: Cocaine and Federal Sentencing Policy, 19 (May 2002).

bolstering Mena's character, while degrading Roberson's).  Because Mena's testimony was critical to the government's case, Roberson argues, a new trial is necessary.  The government concedes, correctly, that it did not lay an adequate foundation to ground Mena's testimony.  Nevertheless, the government argues that the error was harmless in light of the overwhelming evidence of Roberson's guilt.

We agree with the government that the error was harmless because it is "highly probable that the error did not influence the verdict."  United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005) (quotation marks omitted) (describing the harmless error standard for non-constitutional evidentiary errors).  Roberson attempts to rebut the government's "overwhelming evidence" argument by pointing to various weaknesses in the government's case.  For instance, Roberson asserts, the testimony of agents Kappler and Quinn identifying Roberson was fallible.  But even assuming that this testimony was not overwhelming by itself, it is notable that all of the government's evidence, including the testimony of Kappler and Quinn, and the recorded audio and video evidence, corroborates Mena's account of what happened.  Given the wealth of evidence supporting Mena's testimony, it is highly unlikely that his veracity, at least with respect to the events of March 10 and 11, 2003, was seriously questioned by the jury.  Moreover, we doubt that the jury would view the relative addictiveness of crack versus powder cocaine to be an important factor for drawing its conclusions about the character of the two men.  Mena admitted on

the stand that he was a dealer of, among other drugs, powder cocaine. It is highly improbable that any diminutive boost Mena's credibility may have received from being cast as a dealer of a less addictive form of cocaine would have influenced the jury's verdicts.

## C.   Sentence

At sentencing, the district court heard argument concerning whether the mandatory minimum sentence on the drug charge should be doubled from ten years to 20 years in light of Roberson's 1996 Massachusetts conviction for distribution of marijuana in violation of Mass. Gen. Laws ch. 94C, § 32D. See 21 U.S.C. § 841(b)(1)(A) (providing a 20-year mandatory minimum for any person convicted under § 841(a) that has "a prior conviction for a felony drug offense"). Roberson argued that the prior Massachusetts conviction was not a "felony drug offense" under § 841(b)(1)(A) because Massachusetts law categorized the offense as a misdemeanor. The district court rejected Roberson's argument, finding that the CSA clearly defines a "felony drug offense" as any prior conviction for an offense punishable by more than one year of imprisonment. See 21 U.S.C. § 802(44). Because Roberson's 1996 Massachusetts conviction was punishable by up to two years in prison, see Mass. Gen. Laws ch. 94C, § 32C, the court found that it qualified as a "felony drug offense" notwithstanding the state's classification of the offense as a misdemeanor.

On appeal, Roberson contends that the district court erred by applying the 20-year mandatory minimum to the drug charge.

Roberson's arguments hinge on the premise that two defined terms are triggered by § 841(b)(1)(A). Citing to several canons of statutory construction and to the legislative history of the CSA, he argues that the definition of "felony drug offense" contained in § 802(44) is modified by the definition of "felony" contained in § 802(13). See 21 U.S.C. § 802(13) ("The term 'felony' means any Federal or State offense classified by applicable Federal or State law as a felony."). Roberson contends that both of these definitions must be satisfied to trigger § 841(b)(1)(A)'s 20-year mandatory minimum. Under Roberson's interpretation, a prior conviction is a "felony drug offense" under § 841(b)(1)(A) only if the prior drug offense is both (1) punishable by more than one year in jail, see id. § 802(44), and (2) classified as a felony by the relevant federal or state authority, see id. § 802(13).

A recent D.C. Circuit decision supports Roberson's position. See United States v. West, 393 F.3d 1302 (D.C. Cir. 2005).[7] Like Roberson, the defendant in West had been convicted under 21 U.S.C. § 841(a) and (b)(1)(A)(iii) for distributing more than 50 grams of cocaine base. The district court increased the mandatory minimum from ten to 20 years based on a prior drug conviction in Maryland that was classified by that state as a misdemeanor, but which was punishable by up to four years in prison. On appeal, the D.C. Circuit vacated the defendant's 20-year sentence, holding that the definition of "felony drug offense"

_____

[7]To our knowledge, the D.C. Circuit is the only federal appellate court to have addressed this issue to date.

provided by § 802(44) must be read in conjunction with the definition of "felony" provided by § 802(13). The D.C. Circuit found the defendant's position -- that Congress intended "felony drug offense" to incorporate the definitions contained in both § 802(13) and 802(44) -- was "at least as plausible" as the government's -- that § 802(44) alone controls. Id. at 1315. Invoking the rule of lenity, the court held that the enhancement provision of § 841(b)(1)(A) is limited "to those instances in which the prior drug offense is both punishable by more than one year and classified as a felony by controlling authority." Id. Roberson argues that, even if we do not adopt his construction of the statute, we should follow the D.C. Circuit and apply the rule of lenity to resolve the issue in his favor.

Roberson's challenge to the applicability of the 20-year mandatory minimum sentence presents pure legal questions of statutory construction. As such, our review is de novo. Doyle v. Huntress, Inc., 419 F.3d 3, 8 (1st Cir. 2005). "As in any case of statutory construction, our analysis begins with the language of the statute." Zimmerman v. Cambridge Credit Counseling Corp., 409 F.3d 473, 475 (1st Cir. 2005) (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999)). We accord the statutory text "its ordinary meaning by reference to the 'specific context in which that language is used, and the broader context of the statute as a whole.'" Mullane v. Chambers, 333 F.3d 322, 330 (1st Cir. 2003) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)). If the statutory language provides a clear answer, the

inquiry ends.  See Hughes, 525 U.S. at 438; Sepulveda v. United States, 330 F.3d 55, 64 (1st Cir. 2003).

The wording of the provisions at issue, read in the context of the statute as a whole, lead us to conclude that, for the purposes of the CSA, the term "felony drug offense" is a term of art separate and distinct from the term "felony."  In our view, the definition of "felony drug offense" contained in § 802(44) unambiguously controls for the purposes of determining whether the penalty enhancement in § 841(b)(1)(A) is triggered.  We therefore reject Roberson's arguments and decline to invoke the rule of lenity.  See United States v. Councilman, 418 F.3d 67, 83 (1st Cir. 2005) (en banc) (holding that the rule of lenity "only applies if 'there is a grievous ambiguity or uncertainty about the statute'") (quoting Muscurello v. United States, 524 U.S. 125, 138-39 (1998)).  We begin our analysis by delineating the CSA's structure.

In 1970, to consolidate the assorted drug laws then on the books and to enhance federal drug enforcement powers, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act (the "1970 Act").  See Pub. Law No. 91-513, 84 Stat. 1236; see generally Gonzales v. Raich, 545 U.S. 1 (2005).  The Act is subdivided into three titles.  The CSA, established in Title II, addresses the control of drugs and the enforcement of drug laws, see 21 U.S.C. §§ 801-904, while Title III, aptly named the Controlled Substances Import and Export Act ("Import Act"), concerns their import and export to and from the United States, see id. §§ 951-971.

-23-

Part D of the CSA lays out the substantive offenses and the attendant penalties. As is relevant here, Part D makes it unlawful "for any person knowingly or intentionally -- (1) to manufacture, distribute, or dispense or possess with intent to manufacture, distribute or dispense a controlled substance." Id. § 841(a)(1). Pursuant to the "penalties" provision of that section, "any person who violates" § 841(a) through conduct involving, inter alia, "50 grams or more of a mixture" containing cocaine base, "shall be sentenced to a term of imprisonment which may not be less than 10 years." Id. § 841(b)(1)(A)(iii). Further on, the same subsection provides that "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years." Id. (Emphasis added).

Section 802 provides definitions for the terms used in the CSA and the Import Act. The two relevant definitions provide as follows:

> The term "felony" means any Federal or State offense classified by applicable Federal or State law as a felony. . . .

> The term "felony drug offense" means an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant stimulant substances.

Id. § 802(13), (44).

-24-

The most logical interpretation of § 841(b)(1)(A), we believe, is that the phrase "felony drug offense" is a term of art invoked intentionally by Congress to incorporate by reference the specific definition contained in § 802(44). Cf. United States v. Cordoza-Estrada, 385 F.3d 56, 58 (1st Cir. 2004) (holding that the statutory definition of the term "aggravated felony" in 8 U.S.C. § 1101(a)(43)(F) "is a term of art that includes within its ambit certain misdemeanors under state law that carry a sentence of at least one year"); see also Stenberg v. Carhart, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."). Because the term "felony drug offense" is specifically defined in § 802(44), and § 841(b)(1)(A) makes use of that precise term, the logical, commonsense way to interpret "felony drug offense" in § 841(b)(1)(A) is by reference to the definition in § 802(44). See O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996) ("[C]ourts are bound to afford statutes a practical, commonsense reading.").

Roberson argues that § 802(44)'s definition must be read as incorporating the definition of "felony" in § 802(13) because the term "felony drug offense" contains within it the defined term "felony." Because the definition of a defined term is ordinarily triggered by every reference to that term within a statute, see 1A & 2A Norman J. Singer, Sutherland: Statutes and Statutory Construction, §§ 20:8, 47:7 (6th ed. 2000), Roberson argues, the

-25-

definition of "felony" is embedded in both § 802(44)'s definition of and § 841(b)(1)(A)'s reference to "felony drug offense."

But the term being defined is not ordinarily read as being itself a part of the definition of the term. If Congress had intended the definition in § 802(44) to cross-reference the definition in § 802(13), it could have indicated such a cross-reference in the text of the <u>definition</u>. For example, Congress could have written § 802(44) to state that "the term 'felony drug offense' means a felony . . . ."[8] Indeed, such internal cross-referencing, defining one term by reference in the text of the definition to another defined term, is not unusual in the United States Code. <u>See, e.g.</u>, 18 U.S.C. § 1961(5) (defining a "pattern of racketeering activity" as requiring, inter alia, "at least two acts of racketeering activity," thereby expressly cross-referencing the separately defined "racketeering activity" in § 1961(1)); 18 U.S.C. § 1956(c)(4) (defining a "financial transaction" as, inter alia, "a transaction," thereby expressly incorporating the definition of "transaction" in § 1956(c)(3));[9] <u>see</u> <u>Zimmerman</u>, 409 F.3d at 475-76 (looking to Congress's method of drafting statutes in other parts of the Code as an aid in interpreting statutory text).

---

[8]Such a formulation would have been harmonious with the pre-1994 version of § 841(b)(1)(A) which defined a "felony drug offense" as "an offense that is a felony . . . ." <u>See</u> <u>infra</u> note 10.

[9]Roberson does not cite any examples where Congress has cross-referenced to a defined term by placing that defined term within another defined term (as opposed to placing it within the text of the definition).

-26-

Had Congress intended to require both definitions for the purposes of § 841(b)(1)(A), but also wished to preserve a distinct definition of "felony drug offense" for the purposes of other provisions, it could have accomplished its purposes within the text of § 841(b)(1)(A). For example, Congress could have written § 841(b)(1)(A) to trigger a 20-year mandatory minimum whenever any person commits a violation of § 841(a) "after a prior conviction for a felony drug offense that is classified by applicable Federal or State law as a felony has become final."

Congress did not use any of these conventions. Thus, we are left with a statutory provision that specifically references a defined term, "felony drug offense." Where, as here, Congress defines what a particular term "means," that definition controls to the exclusion of any meaning that is not explicitly stated in the definition, see Sutherland § 47:7 (citing Colautti v. Franklin, 439 U.S. 379, 392 & n.10 (1978)), and regardless of the ordinary meaning of the words, see id. at § 20:8 (citing Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485 (1947)); Cordoza-Estrada, 385 F.3d at 58.

The district court's construction, that § 802(44) alone provides the definition of "felony drug offense," is further supported by an analysis of the statute as a whole. See Shalala, 79 F.3d at 176 ("[A] court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language."). Reviewing the substantive provisions in the CSA

reveals that the term "felony drug offense" is utilized only in §
841(b)(1). The term also appears in a parallel provision of the
Import Act. See 21 U.S.C. § 960(b). In both statutes, the term is
used solely to specify the type of prior conviction that will
trigger a mandatory sentence enhancement. In some instances, the
sentencing floor is enhanced. See id. §§ 841(b)(1)(A) and (B);
960(b)(1) and (2) (all doubling the minimum sentence when the
defendant's violation of the subject section was committed "after
a prior conviction for a felony drug offense has become final").
In others, the sentencing ceiling is enhanced. See id. §§
841(b)(1)(C) and (D); 960(b)(3) (all increasing the potential
maximum sentence when the defendant's violation of the subject
section was committed "after a prior conviction for a felony drug
offense has become final"). In all events, a prior conviction for
a "felony drug offense" will result in a significant upward re-
calibration of the statutorily mandated sentencing range.

In contrast, the term "felony" (without the accompanying
words "drug offense") is utilized extensively throughout the CSA
for a variety of purposes. See, e.g., 21 U.S.C. §§ 824(a)(2)
(providing circumstances under which a registration to manufacture
or distribute controlled substances may be revoked); 841(e)
(providing circumstances in which an injunction is available under
§ 841); 843(b) (forbidding the use of a communication facility to
accomplish the commission of a felony); 843(d)(1-2) (setting a
maximum sentence for violations of § 843 for persons with a prior
felony drug conviction); 848(c)(1) (defining a "continuing criminal

enterprise" as involving a felony violation); 853(d) (creating a rebuttable presumption in favor of forfeiture against any person convicted of a felony); 862a(a) (denying eligibility for certain assistance and benefits programs for any person convicted of an offense classified as a felony); 878(a)(3) (granting drug enforcement officers the power to make warrantless arrests where there is probable cause to believe a felony has been committed).

Congress's decision to use the precise term "felony drug offense" in § 841(b)(1), instead of the more broadly used term "felony," evidences an intent to distinguish these sentence enhancement provisions from the other provisions that refer to the generic "felony." See Citizen's Awareness Network, Inc. v. United States, 391 F.3d 338, 346 (1st Cir. 2004) ("The principle is clear that Congress's use of differential language in various sections of the same statute is presumed to be intentional and deserves interpretative weight."); Sutherland, § 46:05 ("[W]here the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded."). Given the structure of the CSA, and the targeted use of the term "felony drug offense," the logical inference is that Congress intended the statutory enhancements in § 841(b)(1)(A) to be triggered by reference to § 802(44) alone. As the government has suggested, Congress may have wished to avoid the possibility that the substantial consequences of the mandatory sentence enhancements  in

§ 841(b)(1)(A) would turn on the happenstance of a state's classification of a prior offense.[10]

Roberson's invocations of the canons of statutory construction do not persuade us that the statute is ambiguous. Roberson argues that, because the definitions in § 802(13) and 802(44) are part of the same definitional section and address the

[10]Prior to 1988, § 841(b)(1)(A) provided that a prior conviction for, inter alia, "a <u>felony</u> under any . . . law of a State" would trigger enhanced penalties. Pub. Law No. 99-570, § 1002, 100 Stat. 3207, 3207-4 (1986) (emphasis added). The term "felony drug offense" was added to § 841(b)(1)(A) in 1988 and the definition was placed directly in the substantive subsection, but the applicability of the penalty enhancement still depended on the classification of the prior offense as a felony. See Pub. Law No. 100-690, § 6452(a)(2), 102 Stat. 4181, 4371 (1988) ("[T]he term 'felony drug offense' means an offense that is . . . a felony under any law of a State . . . ."). In 1994, Congress amended the substantive enhancement provisions of both the CSA and the Import Act so that they all uniformly used the term "felony drug offense." See Pub. Law No. 103-322, § 90105, 108 Stat. 1796, 1987-88 (1994). It also replaced the classification-based definition of "felony drug offense" with the new sentence-based definition of the term that presently resides in § 802(44). See id.
Roberson contends that the 1994 amendment was intended merely to make uniform the parallel provisions in the CSA and the Import Act. But such a structural intent does not preclude an additional substantive intent: to replace the old classification-based definition of "felony drug offense" with a new definition which considers only the potential length of the sentence. See Zimmerman, 409 F.3d at 476 (noting that a court "may assume that . . . Congress was aware" of the previously existing statutory provisions, and thus that its choice of "a different formulation" was intentional). Such an intent makes sense in the context of the evolving nature of the CSA. Initially, the district courts were given broad leeway in fashioning sentences, but Congress reversed course in 1984 by enacting mandatory penalties to avoid sentencing disparities. See Todd E. Gonyer, <u>Federal Sentencing in a Post-Chapman World: What is a "Mixture or Substance" Anyhow?</u>, 46 U. Kan. L. Rev. 983, 984-88 (1998). Subsequent amendments in the 1980's increased the consequences of those mandatory penalties. See id. Thus, it would not be surprising to learn that Congress intended the 1994 amendments to ensure that the mandatory recidivist penalty provisions would be applied uniformly not only across statutory lines, but also across state lines.

-30-

same subject matter -- the classification of offenses -- they are coequal and should be read in pari materia (i.e., they should be construed together).  See United States v. Kelley, 712 F.2d 884, 889 (1st Cir. 1983).  Moreover, continues Roberson, if we do not read the definition of "felony" in conjunction with the definition of "felony drug offense," then the definition of "felony" will become superfluous.  See United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.").

The above-cited canons, as well as the canon, cited by the government, that a specific provision governs as against a general provision, see Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384-85 (1992), are corollaries of the cardinal rule that courts must strive to harmonize all the provisions of a statute to give them all force and effect, see Sutherland, § 46:06.  Absent a conflict between the two provisions, resort to the canons (which are, after all, only tools of construction) is unnecessary.  Here, we find no tension between the definition of "felony" and the definition of "felony drug offense."  Viewing the statute as a whole, the two separate definitions are harmonized by recognizing that they are used for different purposes.  The structure of the statute, and the differential use of the two terms, lead us to infer that the terms were intended to carry independent meanings for independent purposes.  Applying the doctrine of in pari materia

-31-

to merge two definitional clauses would thus defeat their very purposes. Cf. Kelley, 712 F.2d at 889 (holding that two substantive provisions aimed at regulating the same area of conduct -- disqualifying judges with a personal bias against a party -- should be construed in pari materia).

Because "felony drug offense" is a defined term of art and we have found nothing in sections 802(44) or 841(b)(1)(A) indicating a Congressional intent to incorporate the definition of "felony" in the term "felony drug offense," we find no statutory ambiguity. The 20-year mandatory minimum contained in § 841(b)(1)(A)(iii) is triggered when the defendant has a prior conviction for an "offense that is punishable by imprisonment for more than one year under any law of the United States." Accordingly, we find that the district did not err in applying the 20-year mandatory minimum sentence to the drug charge.[11]

---

[11]Roberson also argues that we should vacate his sentence because the district court violated his Sixth Amendment rights by imposing the 20-year mandatory minimum sentence based on a prior conviction that the government did not prove to the jury beyond a reasonable doubt. Although this circuit has previously read Almendarez-Torres v. United States, 523 U.S. 224 (1998), to foreclose such an argument, see United States v. Ivery, 427 F.3d 69, 75 (1st Cir. 2005), Roberson urges us to re-examine the issue in light of a trio of recent Supreme Court decisions, Shepard v. United States, 544 U.S. 13 (2005); United States v. Booker, 543 U.S. 220 (2005); and Blakely v. Washington, 542 U.S. 296 (2004). Roberson contends that these three cases combine to undermine the continuing validity of Almendarez-Torres and our circuit precedent. We recently rejected this argument sitting as an en banc court. See United States v. Jimenez-Beltre, 440 F.3d 514, 520 (1st Cir. 2006) (en banc) ("[W]e are bound to follow [Almendarez-Torres] until it is expressly overruled.").

### III.

For the foregoing reasons, we **<u>affirm</u>** Roberson's convictions and sentence.