# United States Court of Appeals
## For the First Circuit

No. 08-1122

UNITED STATES OF AMERICA,

Appellee,

v.

TIMOTHY J. MEADOWS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Stahl, and Howard,
Circuit Judges.

Bruce Green, for appellant.
Paul G. Levenson, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief for
appellee.

July 8, 2009

**TORRUELLA, Circuit Judge.** In this case, defendant Timothy J. Meadows ("Meadows") appeals his conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Meadows challenges the district court's refusal to suppress his statements, the district court's handling of his status as a felon during trial, certain statements made in closing arguments by the prosecutor, and certain jury instructions. After careful consideration, we affirm.

## I. Background

The evidence presented at the suppression hearing was as follows.

On July 10, 2006, Brockton police officer Richard Gaucher was on a detail near the Battles Farm housing complex in Brockton, Massachusetts. At approximately 9:00 PM, he observed a car with three occupants drive into the complex. Gaucher noticed that the car was missing a rear license plate light and a signal light. Gaucher then activated his lights and pulled the car over. Gaucher observed the passengers moving within the car. The car then stopped, the front passenger door opened, and the passenger, later identified as Meadows, fled on foot toward nearby townhouses.

Gaucher used his radio to communicate that he had made a motor vehicle stop and required assistance for foot pursuit. Gaucher questioned the driver, Shawn Meadows, who identified the

person who ran as his brother, Timothy Meadows.[1]  Officers Michael Norman and Keith Shanks also arrived at the scene.  They knew Shawn Meadows, who informed them that his sister, Tia Meadows, lived in the Battles Farm complex.  Her address was relayed over the radio, and the dispatcher indicated that a family disturbance was reported at that address earlier in the day.

Officers Norman and Shanks proceeded to Tia Meadows's unit.  Gaucher testified that Tia Meadows's unit was not in the direction that Timothy Meadows initially ran.  Meanwhile, Gaucher found bullets in the shorts of the other passenger, John DePina.  Gaucher announced that discovery on the police radio, and warned that Timothy Meadows might be armed.  The dispatcher also reported that Timothy Meadows had been charged with a firearm offense in 1999.  Norman and Shanks received these warnings before arriving at Tia Meadows's unit.

Tia Meadows allowed Norman and Shanks to enter and indicated that Timothy Meadows was upstairs.  Shanks called to Timothy Meadows to come downstairs.  He did so, and the officers handcuffed him and led him outside.  Gaucher proceeded towards Tia Meadows's home, encountered Timothy Meadows and Shanks outside, and read him his Miranda rights.  Gaucher asked him if he had a gun,

---

[1]  Shawn Meadows told Gaucher that Timothy Meadows might have had an outstanding warrant.  Gaucher broadcasted an alert to that effect.  Dispatch later responded that Timothy Meadows did not have any outstanding warrants.

and he said he did not.  Meanwhile, Norman conducted a protective sweep of Tia Meadows's home.

At some point, Gaucher learned that another officer had discovered a firearm in the courtyard near where Meadows ran from the car.  The firearm was found approximately five minutes after Meadows was handcuffed.[2]

Gaucher then spoke to two residents of the housing complex, a mother and daughter, who saw an individual flee from the car, run across the courtyard, and fall down at an area in the center of the courtyard.  The residents had previously directed another officer to this area, where the officer discovered the firearm.  Gaucher asked the witnesses to look out their windows to see if they saw the individual who ran.  Meadows was standing outside, handcuffed, next to a police cruiser.  The witnesses identified Meadows.  Meadows was then formally placed under arrest.  Meadows later made incriminating statements, detailed below.

At the suppression hearing, Gaucher also used a map to show the location of the stop, the direction Meadows ran, and the location of Meadows's sister's home.  The government also played excerpts of a tape recording of the police dispatch channel, which helped establish the order of events.

---

[2] Gaucher initially testified at the hearing that he learned about the discovery of the gun after giving Meadows his Miranda warnings, but he revised his testimony after his recollection was refreshed by his police report.  The district court credited his initial testimony, not his refreshed recollection.

At the suppression hearing, the court suppressed the witnesses' identification as unduly suggestive. The court refused to suppress the incriminating statements and ruled orally:

> So [the police] knew they were looking for Timothy Meadows. They knew that Meadows had fled on foot from a routine traffic stop. They knew that Meadows had followed a rather strange route through the housing complex to get to 311, an evasive route, if you will. He just didn't run directly there. They knew that there had been a report of a domestic disturbance at that location. They knew that a passenger in the car was carrying ammunition for a firearm. And they knew that Meadows had previously been charged with firearm offenses. In light of that knowledge -- oh, also, they observed that when Meadows came downstairs he was sweating and out of breath, though he had, he says he had been there for some time.[3] All of those circumstances, which I find credible, are sufficient under the reasonableness test of the Fourth Amendment to in effect seize him and sort the matter out. So it was not unreasonable to place handcuffs on him. It was not unreasonable to do a protective sweep which protective sweep was reasonable, and likewise it was reasonable to bring him outside where the safety of the officers could better be obtained, the safety of the officers and people in the various apartments, especially in light of the fact that other residents in the housing project, I infer, were coming out of their apartments to see what was going on. So, so far that's all reasonable. At that time, Officer Gaucher administers Miranda warnings and inquires of Mr. Meadows. Mr. Meadows denies he has a weapon, and at that time a weapon is found, sufficiently in the area that it is a

---

[3] At the suppression hearing, no one testified that Meadows was sweating and out of breath. But, Meadows adduced this fact in his proposed findings of fact, filed as part of his motion to suppress, prior to the hearing.

> reasonable inference that the weapon most
> likely was discarded by the person who fled
> from the vehicle which person was Mr. Meadows.
> That constitutes probable cause for his arrest
> and he was appropriately arrested.
> The motion to suppress, other than the part I
> already allowed, is denied.  Mr. Meadows'
> rights are saved.  All the matters that follow
> thereafter, he having been properly
> administered the Miranda warnings, are not
> suppressed and may be used by the government.

The case then proceeded to trial.  Prior to jury selection, the defendant asked the court to instruct the jury simply that Meadows was among the class of people not allowed to carry a firearm.  The court stated it would not force the prosecution to go that far, and that the defendant only had a right to require the prosecution to stipulate the existence of a prior felony.  During jury selection the court explained that Meadows was a felon and was not permitted to possess a firearm.  The court then asked whether Meadows's status as a felon would influence the jurors.  During pretrial instructions, the court also stated that Meadows was "among that group of people whom under the law they never again can possess a firearm or a piece of ammunition."

At trial, the government called the mother and daughter from the housing complex who witnessed an individual fall in the field after running from the car.  The mother testified that after the individual fell, he made a motion patting the ground, then got up and kept running.  She testified that she told an officer what she saw, that the officer went to that area with a flashlight, and

that the officer called other police officers who took pictures of that area. She later learned that a gun was found in the spot where the individual fell. She did not identify Meadows, but only described the individual as wearing blue jeans and a white shirt. The daughter also testified to the same events. And the officer who found the gun also corroborated that testimony. The officer also testified that the grass was bent, so that it looked like someone had fallen there. The government also introduced Meadows' grass-stained jeans.

Shawn Meadows also testified that his sister, Tia Meadows, had been involved in domestic disputes with her boyfriend, Darrell Rodney, on the date in question. Shawn Meadows explained that he had already been over to her house once that day, without Timothy Meadows, and had a physical altercation with Rodney. After another dispute arose later that day, Shawn Meadows decided to change the locks on the apartment. On the way, Shawn Meadows picked up his brother, Timothy Meadows, and Timothy Meadows' neighbor, John DePina. Shawn Meadows testified that when they were pulled over, Timothy Meadows ran from the car. Shawn Meadows never saw a gun on Timothy Meadows, nor heard him discuss a gun or violence. John DePina, the other passenger, testified that while in the car on the way to Battles Farm housing complex, Timothy Meadows asked him to hold two bullets.

Officer Shanks also testified. After Shawn Meadows told Shanks and Norman where his sister lived, the two proceeded to that unit. Inside, Shanks called up to Timothy Meadows to come downstairs. Meadows did so and was sweating and out of breath. Shanks and Norman frisked and handcuffed Meadows. Meadows stated that he had been at his sister's house all day. Shanks testified that on the ride to the police station, Meadows first said that the gun was not his and was not found on him, but later began asking the officers if he could cooperate and get help to get out of his situation.

Officer Gaucher also testified, again recounting the events of that night. He recounted that Meadows initially denied being in possession of a firearm. He further testified that after being given his <u>Miranda</u> warnings, being arrested, and being taken to the station, Meadows told him that he had a five-month old daughter and that he wanted to cooperate to avoid going back to jail. According to Gaucher, Meadows admitted that he had bought the gun from a drug dealer a year ago. Later, when Meadows overheard Gaucher asking another police officer about whether the gun's magazine's capacity exceeded ten rounds, Meadows stated that the gun would not hold more than nine rounds. Meadows also stated that he brought the gun with him to scare Rodney, who had previously threatened his brother, Shawn Meadows. Officers Shanks

and Nelson also corroborated Gaucher's testimony about Meadows's incriminating statements at the station.

On cross-examination, defense counsel elicited from Gaucher that these statements were not recorded, but that Massachusetts police departments have been instructed to begin recording confessions. Also on cross-examination, Gaucher was asked about whether there was any indication that law enforcement would accept Meadows's offer of cooperation. Gaucher said that was a possibility that was rejected because Meadows's record was "too extensive." Defense counsel did not move to strike this answer.

Further testimony came from Agent Robert White of the Bureau of Alcohol, Tobacco, Firearms and Explosives, who interviewed Meadows at the station with other officers. White recounted that Meadows said that he was going to his sister's house because she had been in a fight with her boyfriend. According to White, Meadows said that he brought the firearm because he knew that his sister's boyfriend also possessed one. Meadows gave the first name of the drug dealer from whom he had, through a friend, purchased the firearm. Meadows indicated he had a steady job, a young daughter, that he did not wish to return to prison, and that he would cooperate. White testified that the conversation was limited because Meadows could not provide significant targets.

A fingerprint expert also testified that no prints were found on the gun that was recovered, but that fingerprints are rarely found on guns. Other witnesses established that the firearm moved in interstate commerce.

After the close of evidence, the court conducted a charge conference. Meadows requested an instruction that the Massachusetts Supreme Judicial Court has ruled that a cautionary instruction should be given when unrecorded statements of a defendant are admitted. Over the government's objection, the court indicated that it would inform the jury "that the Supreme Judicial Court has advised state law enforcement officers to record statements and [there are] various cautions in those cases if such recordings are not made," but that there is no such requirement in a federal case.

During closing arguments, the prosecutor stated, among other things, that the resident witness "saw Timothy Meadows run out of that car" and that her daughter "also saw where Timothy Meadows ran through the courtyard behind Unit 205 and where he fell where a few minutes later the gun was found, the same precise spot." The prosecutor later acknowledged that the resident did not identify Meadows in court. But, the prosecutor concluded, "you know exactly who it was that ran" since Shawn Meadows identified his brother as running from the car after it was stopped.

-10-

The prosecutor also said that, though he did not have to prove motive, the evidence showed that Meadows was motivated to possess a gun to threaten Rodney. Specifically, he observed that Rodney's abuse of Tia Meadows had already escalated into violence between Shawn Meadows and Rodney and that Shawn and Timothy Meadows were expecting to encounter Rodney. Later, the prosecutor commended the police for handling the situation, and stated "we'll never know what exactly they had planned that night with that gun, and even if they didn't have planned what might have happened, we don't have to know that" because the police "defused the situation."

The court then instructed the jury. Among other instructions, the court briefly returned to the issue of Meadows's status as a felon, advising the jurors to take that as a given. On the subject of Meadows's running from the police, the district court instructed:

> Now, from that conduct, from that conduct you could infer, you could draw an inference that he didn't want to have anything to do with the police. And one possible inference is he had, he was demonstrating by running, a consciousness of guilt. No one, no one could be convicted of a crime on the basis of consciousness of guilt standing alone. You may consider it along with all the other evidence. But if that's the only evidence of guilt, he could not be convicted on the basis of consciousness of guilt standing alone. And here's why.
> People have lots of reasons for not wishing to interact with the police. Some reasons are entirely benign. After all, it's a given in

this case, you must accept, I've instructed you, that he's in that class of persons who are felons. Likewise, if he didn't want to have anything to do with the police that night because he felt guilty about something other than possessing a firearm. That's the only charge here. There's no other charge. There's no other evidence, because it would be irrelevant to this charge. So while you could consider that running from the vehicle is consciousness of guilt with respect to this charge, and you can consider it with respect to all the other evidence, you can never convict based on that evidence alone and you must consider that there may be other reasons for not wanting to interact with the police, some of which are absolutely benign and conceivably some of which are less benign but have nothing to do with this case, therefore, it's not consciousness of guilt about this particular offense.

Meadows had objected to such an instruction during the charge conference. He did not object after the instruction was given. In discussing the evidence, the court also stated:

I want to give you an example of a reasonable inference both to show you what it is and to show you how far and no further you can take it. Let's say -- and this has nothing to do with the case but -- it has nothing to do with the case. -- a witness testifies she's walking along a road. She looks out over a field of barley or wheat. And she sees that in that field the wheat is lying down in an irregular course through the field. And let's say you believe that testimony. That's what you believe, that's what she saw.
Now, if that's all the testimony you have, it's a reasonable inference -- it's a circumstance. I mentioned circumstantial evidence. -- that something went through that field. Because if it was a windstorm the whole field would be lying down. Something went through there to knock the wheat down in that course. That's a reasonable inference.

-12-

> But if that's all of the evidence you have, you don't know what went through there. Was it a child, an adult, someone on a dirt bike, an animal of some sort, big, small. You'd need other evidence. So, yes, you may use your common sense. Yes, you may draw reasonable inferences. But you may not guess, you may not speculate, you're not back in the jury room wondering about what's possible, maybe, could have, or even probable. The burden of proof here is on the government beyond a reasonable doubt.

Meadows did not object to this instruction.

The court did not give an instruction regarding recording statements made by arrestees. After the instructions, defense counsel stated, "Your Honor, I don't have to restate the instructions I submitted to you, but I would ask that the ones you elected not to give during the --." The court interrupted, "Yes, I won't give that."

The jury returned a guilty verdict. Meadows was later sentenced to 15 years imprisonment as an armed career felon. Meadows timely appealed. Meadows challenges his conviction, but does not separately challenge his sentence.

## II. Discussion

Meadows challenges the admission of his incriminating statements, the district court's discussion of his status as a felon, the prosecutor's statement that the resident identified him, the prosecutor's discussion of Meadows's motive and "what might have happened," the district court's flight instruction, the district court's instruction on reasonable inferences, and the

-13-

district court's failure to give the instruction on unrecorded statements.  We address each issue in turn.

## A.  Motion to Suppress

"'We apply a mixed standard of review to the district court's denial of the motion to suppress. We review the court's findings of fact for clear error and its application of the law to those facts de novo.'" United States v. Dunbar, 553 F.3d 48, 55 (1st Cir. 2009) (quoting United States v. Morales-Aldahondo, 524 F.3d 115, 118-19 (1st Cir. 2008)). "To succeed, [Meadows] 'must show that no reasonable view of the evidence supports the district court's decision.'"  Id. (quoting Morales-Aldahondo, 524 F.3d at 119).

Meadows argues that he was effectively arrested when the police handcuffed him in his sister's home and led him outside.  He reasons that the gun had not yet been discovered and argues that this handcuffing occurred without adequate justification, thus constituting an arrest without probable cause.  He then argues that the statements occurring after this arrest should have been excluded.  The government counters that the officers' actions were justified as a Terry stop.  See Terry v. Ohio, 392 U.S. 1 (1968).  The government also argues that, in any event, Meadows only made incriminating statements after the gun was found and he was formally arrested, so there is no causal connection between the handcuffing and the statements.  We agree that the police were

-14-

justified in restraining Meadows as part of a Terry stop, and so do not reach the causation issue.

Meadows does not argue that officers Nelson and Shanks lacked reasonable suspicion to initiate a Terry stop when they located him. Rather, Meadows analogizes to United States v. Acosta-Colón, where we found the scope of a valid Terry stop was exceeded when the defendant, suspected of trafficking drugs at the airport, "was prevented from boarding his plane, placed in handcuffs, involuntarily transported (in restraints) to an official holding area some distance from the place of the original stop, confined to a small interrogation room and kept there under observation for more than a momentary period." 157 F.3d 9, 15 (1st Cir. 1998). We agree that that case nicely encapsulates the legal issues relevant here, but we disagree that its result is appropriate on these facts.

In Acosta-Colón, we explained that "'based merely on a reasonable and articulable suspicion, a police officer may make a brief stop or seizure of an individual to investigate suspected past or present criminal activity.'" Id. at 14 (quoting United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)). Such a Terry stop is only valid so long as "'the action taken was reasonably related in scope to the circumstances which justified the interference.'" Id. (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)). And, "[i]t is often said that an

-15-

investigatory stop constitutes a de facto arrest 'when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest.'" Id. (quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). We must inquire "whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a Terry-type stop." Id. at 15; see also United States v. Moore, 235 F.3d 700, 703 (1st Cir. 2000) ("The court must consider the circumstances as a whole, and must balance the nature of the intrusion with the governmental interests that are served. Officer safety is one such governmental interest . . . ." (internal quotation marks and citation omitted)).

To justify moving the defendant in Acosta-Colón, we required "some specific fact or circumstance that could have permitted law enforcement officers reasonably to believe that relocating the suspect to a detention room was necessary to effectuate a safe investigation." 157 F.3d at 17 (emphasis in original). We recognized that "the use of handcuffs, being one of the most recognizable indicia of traditional arrest, 'substantially aggravates the intrusiveness' of a putative Terry stop." Id. at 18 (quoting United States v. Glenna, 878 F.2d 967, 972 (7th Cir. 1989)). Nonetheless, we held that "the use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a de facto arrest." Id. Rather, "[p]olice officers

engaged in an otherwise lawful stop must be permitted to take measures -- including the use of handcuffs -- they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others." Id. But, police officers may not use handcuffs as a matter of routine. Id. We concluded:

> Thus, when the government seeks to prove that an investigatory detention involving the use of handcuffs did not exceed the limits of a Terry stop, it must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.

Id. at 18-19.[4]  In Acosta-Colón, no facts justified the handcuffing, since nothing indicated resistance or belligerence, there was no "evidence that any of the customs officers harbored an actual suspicion that Acosta was armed," and the government relied only on generalized statements that as a suspected drug trafficker, the defendant might be armed. Id. at 19-20.

This case is quite different. There was evidence that police harbored an actual fear that Meadows was armed: Gaucher relayed a warning over the radio after finding the ammunition. See United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004) ("Police

---

[4]  See also United States v. Brame, 284 Fed. Appx. 815, 819 (1st Cir. 2008) (unpublished) (concluding that officers could handcuff a suspect without converting a Terry stop into an arrest where, during the course of the stop, they came to reasonably suspect the defendant was armed).

officers are not limited to personal observations in conducting investigatory activities, and reasonable suspicion for a <u>Terry</u> stop may be based on information furnished by others."). The suspicion announced by Gaucher was reasonable and grounded in a number of facts, which the district court identified. First, from Shawn Meadows's identification, Nelson and Shanks knew that their suspect, Timothy Meadows, had fled from a traffic stop, using an evasive route. This fact also suggests Meadows could still be a flight risk. Such risk can contribute to an officer's reasonable need to handcuff a suspect. <u>Cf.</u> <u>United States</u> v. <u>Wilson</u>, 2 F.3d 226, 232 (7th Cir. 1993) (finding that a suspect's flight, and the risk of future flight, supports the application of handcuffs during an investigatory stop). Second, the arresting officers knew that another passenger in the car from which Meadows had fled was in possession of ammunition. We think it uncontroversial that the discovery of ammunition -- but not a gun -- in the car from which a suspect fled could, together with the other facts present in this case, lead an officer to reasonably suspect that the fleeing suspect possessed the gun that went with the ammunition. <u>Cf.</u> <u>Glenna</u>, 878 F.2d at 973 (discovery of ammunition, together with tip that suspect was armed and other facts, supported use of handcuffs). Third, the officers knew that Meadows was likely going to the home of his sister, where there was a domestic disturbance earlier in the day. Our conclusion does not rest on any one of

these facts individually. Instead, the combined presence of these facts made it reasonable for the officers to suspect Meadows might be in a possession of a firearm, to suspect that violence in connection with the domestic disturbance was reasonably possible, and thus to handcuff Meadows and remove him from the home for their safety while they investigated the situation. See Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004) (affirming summary judgment in a § 1983 action for an officer who stopped the wrong vehicle and cuffed and detained the single driver in the squad car, based on a report that two African American males in a grey or black car were on their way to a nearby destination with a gun, since "[w]here, as here, police officers have information that a suspect is currently armed and that a crime involving violence may soon occur, they are justified in using restraints such as handcuffs without causing an investigatory stop to cross over into an arrest").

Further, since Meadows does not challenge his formal arrest after the firearm was found, the time that Meadows was subject to a Terry stop was only approximately five minutes. This short duration is yet another fact that, when combined with the above reasons, bolsters our determination that the "cumulative impact of the various elements of the stop" did not, in the "total factual context," exceed permissible bounds. Id. at 31-32.[5]

---

[5] We find these facts sufficient and need not decide if Meadows's earlier arrest for a gun charge is relevant in the reasonable suspicion analysis. While we have said that police knowledge of a

-19-

Against these specific facts, Meadows's arguments that the handcuffing was unreasonable are unpersuasive. First, Meadows observes that Shawn Meadows readily identified Timothy Meadows and revealed his sister's address. But this fact, while showing Shawn Meadows was cooperative, did not give the police any reassurance that Timothy Meadows would not pose a risk.

Second, Meadows observes that the warrant check came back negative. This is a non sequitur because a warrant is not necessary for a Terry stop. A warrant would have allowed for a full arrest. Terry stops, by their very nature, may be made without cause for a full arrest.

Third, Meadows questions whether his route was really evasive, as the district court found. But the district court, which heard testimony and traced the path on a map of the housing complex, found otherwise, and Meadows offers no basis for finding clear error.

Fourth, Meadows argues that he fled only a "short distance" and was "easily located and indoors at the time of the encounter." But this fact makes little difference. Meadows does not dispute that he fled from the police. Nor does he dispute that the police knew there had been a domestic disturbance earlier in

recent arrest for related conduct can be relevant to corroborate other evidence in a Terry analysis, see United States v. Monteiro, 447 F.3d 39, 47 (1st Cir. 2006), here the record does not show that the arrest was recent or particularly related to the instant offense, other than simply generally involving firearm possession.

the day at the address to which he fled.  That this address was a short distance from the location of the traffic stop is simply immaterial to whether the police reasonably suspected Meadows posed a risk requiring handcuffing.

Finally, Meadows attacks the district court's conclusion that it was reasonable for the officers to take Meadows out of his sister's home in the interests of safety.  Meadows points to testimony showing that other housing complex residents had begun to gather and suggests that the situation was no safer outside.  But because the officers were rightly concerned that Meadows possessed a firearm, they could reasonably remove him from the house based on a fear that he had secreted the weapon within the home.  Cf. United States v. Ruidíaz, 529 F.3d 25, 32 (1st Cir. 2008) (holding that even without independent safety concerns, an officer may order a suspect out of a vehicle during a Terry stop as a security measure); see also Michigan v. Long, 463 U.S. 1032, 1051 (1983) ("[T]he officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile."). While the home often warrants greater Fourth Amendment protection than a vehicle, the risk posed by the threat of enclosed spaces and secret compartments to officers who are legitimately in a home and are effecting a Terry stop may be comparable in each.  See Romain, 393 F.3d at 75 (finding "no support for the proposition that the

in-home setting automatically eclipses any and all interests in officer safety" and "eschewing bright-line rules and treating the residential nature of the premises as part of the totality of the circumstances in determining whether reasonable suspicion justified particular police actions").  While a residential setting may, in some cases, be of importance in conducting a Terry totality of the circumstances inquiry, here, the officers could reasonably remove Meadows based on a safety concern that Meadows had fled to the home while in possession of a firearm.

So, for the above reasons, we reject Meadows's challenge to the denial of his motion to suppress and conclude that the officers acted within the permissible scope of an investigatory stop when they handcuffed Meadows and removed him from his sister's home.

### B.  Meadows's Status as a Felon

Meadows objects to the extent to which his status as a felon was put before the jury.  Though Meadows's trial counsel requested that the district court not tell the jury that Meadows was a felon at all, Meadows concedes on appeal that the district court's explanation of Meadows's felon status "did appear to be in conformity with the holding in Old Chief," which bars evidence of the name or nature of a prior offense where the defendant seeks to stipulate to his status as a felon.  United States v. Old Chief, 519 U.S. 172, 185 (1997).  Though the district court did not allow

evidence of the name or nature of his prior offenses, Meadows contends that prejudicial information about his criminal history nonetheless came before the jury. Specifically, Meadows complains that Gaucher, Norman, and White all testified that Meadows told them he did not want to go back to jail. He also complains about testimony elicited by his own counsel in cross-examination that the police decided not to use Meadows as an informant because his record was "too extensive."

Meadows did not object to any of this evidence, so we review for plain error. United States v. Manqual-Santiago, 562 F.3d 411, 427 (1st Cir. 2009). "'We will not find plain error unless (1) an error occurred (2) which was clear or obvious and which not only (3) affected [the defendant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005)). Here, this test is clearly not met.

We see no reason to believe that Meadows was unfairly prejudiced by testimony that Meadows said he did not want to go back to jail. Meadows's status as a felon was clearly known to the jury, and the fact that he spent time in jail adds little risk of prejudice and does not provide facts about the name or nature of his prior crime, as barred by Old Chief. This conclusion is only

bolstered by the fact that Meadows used his prior jail time in his own closing arguments to explain his flight.

Testimony that Meadows's record was too extensive for use as an informant does add more prejudicial information in that it suggests to the jury that Meadows had more than one prior felony conviction. But, Meadows "cannot persuasively complain about the admission of this evidence, given that it was the defense - not the government - which elicited it in the course of its cross-examination." United States v. Rivera-Rivera, 477 F.3d 17, 20 (1st Cir. 2007). Thus, even though the government may not have been allowed to bring out such testimony, we see no unfair and substantially prejudicial impingement of Meadows's substantial rights in this case.

## C. Closing Arguments

Meadows challenges two portions of the government's closing arguments. Meadows concedes that he raised no objection below, so review is again only for plain error. United States v. Van Anh, 523 F.3d 43, 55 (1st Cir. 2008). Here, there was no misconduct at all.

Meadows first challenges the prosecutor's statement that the resident witness "saw Timothy Meadows run out of that car," even though the witness did not identify Meadows in court. Meadows contends that the government thus improperly referred to the suppressed identification. This argument mischaracterizes the

closing. The prosecutor acknowledged that the witness did not directly identify Meadows, but explained how her testimony coincided with Shawn Meadows's testimony in such a way as to make Meadows's identity clear. The government may ask jurors to draw reasonable inferences from the evidence, and this is just what happened here. See United States v. LNU, 544 F.3d 361, 367-68 (1st Cir. 2008) (specifically approving of a prosecutor's closing argument asking jurors to infer, based on admissible evidence, a conclusion also shown by excluded evidence).

Meadows next challenges the prosecutor's suggestion that the jury consider "what might have happened" if the police had not intervened. Meadows argues this was an improper suggestion that Meadows was part of a sinister plan. This statement was proper as it was made in the context of asking the jury to infer that Meadows's motive in possessing the gun was to confront Rodney, his sister's boyfriend. Such an inference was supported by Shawn Meadows's testimony about his earlier fight with Rodney. Though the government need only show possession to meet its burden, there is no prohibition on introduction of evidence of motive and opportunity as circumstantial evidence of possession. See United States v. O'Shea, 426 F.3d 475, 484 (1st Cir. 2005) ("In other words, evidence of the robbery makes it more likely than not that O'Shea was the passenger in the SUV, had the opportunity to possess the gun, and had the motive and opportunity to throw the gun from

the SUV onto the rotary."). Similarly, there was nothing improper about the prosecutor calling the jury's attention to circumstantial evidence of Meadows's motive in closing arguments. Thus, we reject Meadows's attack on the government's summation.

### D. Jury Instructions

Finally, Meadows raises three challenges to the jury instructions. First he argues that the district court's illustration of circumstantial evidence through the example of a field of wheat unfairly resembled a fact in the case -- that a police officer said that the bending of the grass indicated someone had fallen at the spot the gun was found. According to Meadows, this instruction lent an undue amount of credibility to the government's circumstantial argument that Meadows fell at that spot.

"[W]e review properly preserved objections to the trial court's jury instructions and verdict forms de novo." United States v. González-Vélez, 466 F.3d 27, 34 (1st Cir. 2006). But Meadows did not object to this instruction, so we review for plain error. Id. at 34-35. "This standard is exceedingly difficult to satisfy in jury instruction cases: '[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors.'" Id. at 35 (quoting United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001)).

Here, we see no error at all.  The district court made clear that its example of a reasonable inference had nothing to do with this case.  It was not coaching the jury.  And even if there was some link to the trial evidence, the district court's instruction was well within our rule that, "when instructing a jury, a judge 'may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles.'" United States v. Hernández, 490 F.3d 81, 84 (1st Cir. 2007) (quoting United States v. Maguire, 918 F.2d 254, 268 (1st Cir. 1990)) (upholding a judge's reference to a specific meeting that occurred in a charged conspiracy).  In any event, bent grass only reveals that someone fell on the grass, a fact not prejudicial to Meadows.  And the fact that it was Meadows who fell was established through other evidence (namely the combined testimony of the resident and Shawn Meadows).  The district court's instruction emphasized this distinction between knowing that someone had passed through a field and knowing that a specific person had passed.  So, the instruction was both entirely proper and completely harmless.

Meadows next challenges the district court's flight instruction.  Meadows argues that flight may be equally consistent with innocence, and so flight is not persuasive evidence of consciousness of guilt.  Meadows also again argues that he did not

run far, and that the officers "easily apprehended" him at his sister's house.

Meadows argues that his objection is preserved as he objected to the instruction at the pre-instruction charge conference. But our law is clearly contrary. "To preserve an objection to a jury instruction under Fed. R. Crim. P. 30(d), a litigant must lodge a specific objection and state the grounds for the objection <u>after</u> the court has charged the jury and before the jury begins deliberations." <u>United States</u> v. <u>Roberson</u>, 459 F.3d 39, 45 (1st Cir. 2006) (emphasis in original). "Objections registered during pre-charge hearings are insufficient to preserve the issue." <u>Id.</u> "We review such unpreserved jury instruction claims for plain error only." <u>Id.</u>

Here, Meadows's challenge fails under any standard of review. Meadows does not point to any problem in the wording of the instruction, but rather challenges it in its entirety. Meadows first argues that flight does not always show guilt. But the district court made exactly that point in its instruction, thus properly leaving the issue of the import of Meadows's flight to the jury. <u>See</u> <u>United States</u> v. <u>Rose</u>, 104 F.3d 1408, 1417 (1st Cir. 1997) (upholding a flight instruction on this basis). And, as should be obvious, the fact that Meadows's flight was neither successful nor lengthy is immaterial to the fact that he chose to flee.

-28-

Finally, Meadows directs us to precedent from the Massachusetts Supreme Judicial Court that requires, upon a defendant's request, a cautionary instruction about unrecorded statements made during custodial interrogation. See Commonwealth v. DiGiambattista, 813 N.E.2d 516 (Mass. 2004).[6] Meadows relies on the DiGiambattista decision to argue for such a rule and objects to the fact he did not receive such an instruction.

Meadows requested the instruction at the charge conference, and the district court agreed to give it. After the charge, which did not include the instruction, Meadows's counsel tried to object to the instructions that the court "elected not to give during the--." At that point, the court interrupted, saying "Yes. I won't give that." It is not clear that Meadows was

---

[6]  Specifically, the Supreme Judicial Court held:

> Thus, when the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station), and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care.

Id. at 533-34.

-29-

renewing his specific objection to this instruction at this point,[7] but even giving him the benefit of the doubt, we see no error.

The instruction was not required.  Meadows is in federal court, not state court, and as we have held, there is no federal constitutional right to have one's custodial interrogation recorded.  United States v. Torres-Galindo, 206 F.3d 136, 144 (1st Cir. 2000); see also Roberto Iraola, The Electronic Recording of Criminal Interrogations, 40 U. Rich. L. Rev. 463, 471 (2006) ("The federal courts uniformly have rejected the argument that the Constitution mandates, as a matter of due process, that a defendant's confession be electronically recorded.").

Of course, the Supreme Judicial Court's instruction requirement was made using that court's supervisory power, and not through a constitutional requirement.  DiGiambattista, 813 N.E.2d at 529-32.  But our inherent power as an intermediate appellate court is not so broad as a state supreme court, and must be used "sparingly."  United States v. López-Matías, 522 F.3d 150, 154 n.8 (1st Cir. 2008).  We decline to use any supervisory authority we might have to uniformly require this instruction as a prophylactic measure.  Cf. United States v. Coades, 549 F.2d 1303, 1305 (9th Cir. 1977) (rejecting a request for suppression of unrecorded

---

[7]  See United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996) ("Rule 30 is not satisfied by counsel's pre-charge colloquy with the court or written explanation of grounds alone, nor even by a post-charge attempt to incorporate by reference earlier arguments.").

statements because "[t]he need for the rule suggested by appellant and the particular form such a rule should take are appropriate matters for consideration by Congress, not for a court exercising an appellate function").[8]

Finally, we note that Meadows develops no argument that he was somehow prejudiced through detrimental reliance on the district court's unfulfilled suggestion it would give the instruction. We also see no argument for prejudice since the court nonetheless instructed the jury that it would have to decide the credibility and voluntariness of the statements, and Meadows was able to make his arguments on those grounds through cross-examination and summation. Accordingly, we reject all of Meadows's challenges to the jury instructions.

### III. Conclusion

For the foregoing reasons, Meadows's conviction is affirmed.

**Affirmed**.

---

[8]  See also Torres-Galindo, 206 F.3d at 144 n.3 (Torruella, J.) (expressing one judge's belief that such recording would be preferable).