# United States Court of Appeals

## For the First Circuit

No. 09-1637

United States,

Appellee,

v.

Omar Mohamed,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard, Circuit Judge,
and DiClerico,* District Judge.

Elizabeth Prevett for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

December 9, 2010

---

*Of the District of New Hampshire, sitting by designation.

**DICLERICO, District Judge.** Omar Mohamed entered a conditional guilty plea to a charge of being a felon in possession of a firearm and ammunition, reserving his right to appeal the denial of his motion to suppress. On appeal, Mohamed contends that the manner in which he was detained constituted a de facto arrest without probable cause. As a result, Mohamed argues, the gun discovered when he was pat-frisked was fruit of an illegal search. We conclude that the gun was found during a valid investigatory stop and affirm the district court's decision denying Mohamed's motion to suppress.

## I.[1]

In October of 2007, Patrolman Peter Messina and Sergeant Lucas Taxter were members of the Boston Police Department's Codman Square Safe Street Team. At the time, Codman Square was a high crime area in Dorchester, with drug dealing and multiple shootings occurring there. While Messina was on duty on October 18, he heard gunshots and later learned that an individual had been shot several times inside a pizza shop located on Washington Street near the intersection with Melville Avenue.

On October 19, 2007, at twilight, around 5:45 p.m., Messina and Taxter were on duty, standing on Washington Street at the corner of Lyndhurst Street, in front of the Codman Square Post

---

[1]"We relate the facts as the trial court found them, consistent with record support." United States v. Am, 564 F.3d 25, 27 (1st Cir. 2009) (internal quotation marks omitted).

Office.  They heard five gunshots coming from the area where Washington Street and Melville Avenue intersect. They ran down Washington Street toward Melville Avenue in the direction of the gunshots.

When Messina arrived at the intersection of Washington Street and Melville Avenue, he saw a car stopped in the middle of Dunlap Street, across Washington Street from Melville Avenue, and asked the driver, "Where did he go?"  The driver pointed down Dunlap Street.  Messina saw someone running and turned down Dunlap Street, in pursuit of the runner.  Messina thought the suspect was wearing dark clothing, a tee shirt and shorts, and was a light-skinned black male with a tall, thin build.  At a curve in Dunlap Street, Messina lost sight of the suspect.  Messina slowed down and turned onto Whitfield Street.

Taxter, meanwhile, used his radio to notify headquarters about the gunshots.  He saw a person leaving the pizza shop on Washington Street who pointed down Dunlap Street.  Taxter then saw a security guard crouched in a doorway with his gun drawn.  The security guard indicated that no one had been hurt in the shooting, and he pointed down Dunlap Street.  Taxter saw that Messina was running down Dunlap Street ahead of him and that a man, wearing a black top with a hood, was running in front of Messina.  After Messina and the suspect turned onto Whitfield Street, Taxter shouted to Messina to stop because he had lost sight of the suspect

and was concerned that they could be ambushed if the suspect were armed.

A woman on the second floor porch of a house on Whitfield Street pointed down the driveway of another house on Whitfield Street. A man on the porch also motioned toward the driveway of the same house. Messina and Taxter waited at the driveway for backup to arrive.

After Detectives Paul Schroeder and Steven Beath arrived, the officers proceeded down the driveway in tactical formation with their guns drawn. Schroeder saw someone crouched down under a back deck, looking through the slats and holding a cell phone.[2] Schroeder yelled, "Boston Police" and "Get on the ground." The suspect, who turned out to be Omar Mohamed, immediately dropped the cell phone and laid down on the ground with his hands out.

Schroeder kept his gun pointed at Mohamed while Messina approached him. Messina noted that Mohamed was wearing a dark hooded top and jeans and that he was sweating profusely and panting, and he appeared to be very nervous. Messina handcuffed and then pat-frisked Mohamed. When Messina found a gun on Mohamed, he yelled either "He's got a gun" or "Gun." At that point, Mohamed began flailing, and the other officers helped Messina subdue

---

[2]Mohamed suggests that Messina and Schroeder disagreed about Mohamed's location when he was discovered. A careful reading of the hearing transcript, however, shows that Messina could not see Mohamed when Schroeder discovered him. Therefore, no discrepancy exists between their descriptions of Mohamed's location.

Mohamed and roll him onto his side. Taxter then took the gun from Mohamed's pants pocket. The gun was a .38 caliber revolver and smelled as if it had been fired recently. The chamber showed that all five bullets had been fired.

Messina believed the person he had been chasing was wearing shorts and a tee shirt, and for that reason, Messina put out a message on the police radio that there might be another suspect wearing shorts and a tee shirt. When Messina saw Mohamed stand up, he realized that Mohamed had the same body type, hair, and complexion as the person he had been chasing and decided he had been chasing Mohamed. Messina then cancelled his message that there might be another suspect. Mohamed was arrested, taken to the station, and booked.

A grand jury returned an indictment against Mohamed on a charge of being a felon in possession of a firearm and ammunition. Mohamed filed a motion to suppress the evidence found when he was apprehended and to suppress a statement he made while in custody. Following a hearing at which Messina, Taxter, and Schroeder testified, the district court denied the motion, concluding in a written memorandum and order that the officers' detention of Mohamed was a valid investigatory stop and that their actions were reasonable to determine whether Mohamed was armed and to protect against any physical harm. Mohamed entered a guilty plea on January 20, 2009, reserving his right to appeal the denial of his

motion to suppress.  He was sentenced to sixty months imprisonment and three years of supervised release.

## II.

On appeal, Mohamed contends that the district court erred in denying his motion to suppress the gun found in his pants when he was pat-frisked.  He argues that the officers escalated his detention into an arrest without probable cause, and therefore the gun was the fruit of an illegal search.  The government contends that the officers' actions did not transform the investigatory stop into a de facto arrest and that the gun was discovered legally as a part of the stop.

In considering a challenge to the district court's denial of a motion to suppress, we review the court's factual findings under the clearly erroneous standard and the legal conclusions under the de novo standard.  United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010).  We will affirm the district court's decision denying a motion to suppress "so long as any reasonable view of the evidence supports it."  United States v. Bater, 594 F.3d 51, 55 (1st Cir. 2010) (internal quotation marks omitted).

Officers are permitted, under the Fourth Amendment, to stop an individual, briefly, based on a reasonable suspicion that the individual may be involved in criminal activity.  Foley v. Kiely, 602 F.3d 28, 31 (1st Cir. 2010).  An evaluation of the constitutionality of an investigatory stop involves two steps:  (1)

whether the initial stop was justified and (2) "'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" Schubert v. City of Springfield, 589 F.3d 495, 501 (1st Cir. 2009) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). Reasonable suspicion sufficient to support a stop must "be grounded in specific and articulable facts." United States v. Brown, 621 F.3d 48, 55 (1st Cir. 2010) (internal quotation marks omitted).

Mohamed argues that the discrepancy between Messina's description of the fleeing suspect and his own appearance at the time he was stopped precludes a reasonable suspicion that he was the fleeing suspect. When he was discovered, Mohamed was wearing a large hooded sweatshirt and jeans. Messina thought the person he was chasing was wearing shorts and a tee shirt. Because of the clothing discrepancy, Messina initially thought Mohamed was not the individual he saw running away from the area of the shooting and put out the message that there might be another suspect.

The clothing discrepancy does not undermine the officers' suspicions about Mohamed. Although Messina thought the fleeing suspect was wearing shorts and a tee shirt, Taxter saw that the suspect was wearing a hooded top. Messina later decided that Mohamed was the suspect he chased, based on Mohamed's build and complexion.

In addition, other factors implicated Mohamed. Onlookers pointed the officers toward Mohamed's hiding place. When discovered, Mohamed was peeking out from under a deck behind a house, and he was panting and sweaty, which is consistent with someone who had just run away from the officers, as the suspect had done.[3] Therefore, the circumstances as a whole provided reasonable suspicion that Mohamed was the fleeing suspect or, at least, could have been involved in the shooting, even if he were not the suspect the officers had chased. As long as reasonable suspicion exists, the circumstances need not irrefutably establish that Mohamed was the shooter. See Brown, 621 F.3d at 57.

Mohamed primarily challenges the second step of the analysis of an investigatory stop, arguing that the officers' actions during the stop amounted to a de facto arrest. Because the circumstances that officers face in the course of confronting an individual suspected of criminal activity vary widely, no precise template exists to evaluate the actions taken during a stop. See Klaucke v. Daly, 595 F.3d 20, 25 (1st Cir. 2010). Instead, "the touchstone is the reasonableness of the measures undertaken to

---

[3]Mohamed argues that sweating and breathing heavily is also consistent with nervousness, which would be a likely explanation because he was facing officers with guns drawn. While that may be true, "the test is whether the circumstances give rise to a reasonable suspicion of criminal activity, not whether the defendant's actions are subject to no reasonable innocent explanation." United States v. Stanley, 915 F.2d 54, 57 (1st Cir. 1990); accord Schubert, 589 F.3d at 502.

quell or confirm the officer[s'] suspicions." Id. An investigatory stop becomes a de facto arrest when a reasonable person in the suspect's position would have understood, given the circumstances, that he was essentially under arrest. United States v. Meadows, 571 F.3d 131, 141 (1st Cir. 2009).

Mohamed contends that the officers' actions exceeded the scope of an investigatory stop because they did not have a reasonable basis to surround him with guns drawn, to order him to the ground, and to handcuff him. In particular, Mohamed asserts that because he did not match Messina's description of the fleeing suspect, because he was talking on a cell phone when he was discovered, and because he immediately complied with the officers' orders to get on the ground, they lacked a reasonable basis to believe he was dangerous. As a result, he argues, the investigatory stop became a de facto arrest without probable cause.

The circumstances in this case amply support the measures the officers used to stabilize the situation. Officers are permitted to take actions to protect their own safety and the safety of others in the area. Schubert, 589 F.3d at 503. An officer also may conduct a pat-frisk search if, under all of the circumstances, the officer had a particularized and objective basis to suspect the individual had a weapon. Estrada v. Rhode Island, 594 F.3d 56, 66 (1st Cir. 2010). Although handcuffs are traditionally associated with an arrest, the use of handcuffs

during an investigatory stop does not convert the stop into an arrest as long as the officers involved reasonably believed handcuffs were necessary to protect themselves or others under the circumstances that existed. Meadows, 571 F.3d at 141; United States v. Acosta-Colón, 157 F.3d 9, 18 (1st Cir. 1998).

Messina and Taxter heard five gunshots, and they saw someone running away. They chased the suspect to Whitfield Street where onlookers assisted them by pointing out Mohamed's hiding place. Because the shooter or someone involved in the shooting was likely to be armed, the officers reasonably were concerned for their safety. For that reason, it was reasonable to approach Mohamed with guns drawn. See United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005) (drawing a weapon on a suspect, based on reasonable safety concerns, does not transform an investigatory stop into a de facto arrest).

Despite Mohamed's compliance with Schroeder's commands to lie on the ground with his hands out, the officers reasonably could have suspected that he had a gun and remained concerned for their safety. Messina's impression that the fleeing suspect was wearing different clothing does not undermine the other circumstances which support a reasonable suspicion that Mohamed was either the fleeing suspect or someone else involved in the shooting. Therefore, a pat-frisk to search for guns was an "investigative measure[] [that was] reasonably calculated to uncover evidence of wrongdoing

-10-

related to circumstances giving rise to the officer[s'] initial suspicions." Klaucke, 595 F.3d at 25.

The officers' decision to handcuff Mohamed before conducting the pat-frisk did not convert the stop into a de facto arrest under the circumstances the officers faced.[4] Although officers may not use handcuffs routinely during investigatory stops, officers are permitted to use handcuffs to protect themselves and others. Meadows, 571 F.3d at 141. When challenged, the government "'must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.'" Id. (quoting Acosta-Colón, 157 F.3d 18-19). Therefore, officers may handcuff a suspect within the scope of a valid investigatory stop if they reasonably believe the suspect is armed. See Meadows, 571 F.3d at 141-42.

Such was the situation faced by the officers in this case. As the district court noted, the officers had valid concerns for their safety during the stop. The officers reasonably suspected that Mohamed was the shooter or at least was a suspect involved in the shooting, which means that he very likely would be

---

[4]Although Messina actually applied the handcuffs, Schroeder and Taxter were also involved in the process of stopping and investigating Mohamed.

-11-

armed.  That fact supports the actions they took to stabilize the situation and to protect themselves from Mohamed, should he reach for his gun and attempt to shoot.[5] Mohamed was detained only briefly before the gun was found.  Under the particular circumstances in this case, the district court correctly concluded that Mohamed was detained in a valid investigatory stop that did not become a de facto arrest.

### III.

For the foregoing reasons, the district court's denial of Mohamed's suppression motion is **<u>affirmed</u>**.

---

[5]Mohamed challenges the district court's conclusion that the officers' actions were justified, in part, because of a risk of harm to bystanders and to the public.  He argues that there was no one nearby during the encounter who would have been at risk. Mohamed was hiding behind a house in a residential area and the officers had just seen two people on a porch across the street. Under these circumstances, the district court's conclusion was not clearly erroneous.