# United States Court of Appeals
## For the First Circuit

No. 10-2455

UNITED STATES OF AMERICA,

Appellee,

v.

GREGORY PONTOO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Selya and Howard,
Circuit Judges.

Henry W. Griffin, by appointment of the court, for appellant.
Margaret D. McGaughey, Assistant United States Attorney
(Appellate Chief), with whom Thomas E. Delahanty II, United States
Attorney, was on brief, for appellee.

December 5, 2011

**SELYA, Circuit Judge**.  Defendant-appellant Gregory Pontoo stands convicted as a felon in possession of a firearm.  18 U.S.C. § 922(g)(1).  He asserts that the police stopped him on the street without reasonable suspicion and arrested him without probable cause.  These infringements, he says, demand suppression of the weapon seized in the incident and dismissal of the charge against him.  We think not.

## I.  BACKGROUND

The events surrounding the appellant's arrest took place in Lewiston, Maine.  There are five protagonists: the appellant, Gary Austin, Austin's estranged girlfriend (Sherry Boston), and two Lewiston police officers (Tyler Michaud and Larry Maillet).  As is customary when reviewing the denial of a motion to suppress, we rehearse the facts as supportably found by the court below.  See, e.g., United States v. Ruidíaz, 529 F.3d 25, 27 (1st Cir. 2008).

Officer Michaud began an overnight shift at 11:00 p.m. on August 19, 2009.  Colleagues who had worked the previous shift told him that they had responded to 26 Knox Street to deal with a domestic disturbance involving Austin and Boston (neither of whom Michaud knew).

Officer Michaud's assignment obligated him to patrol alone in a squad car.  Early in his shift, the police received a report that Austin was on a landing outside Boston's window.  Two

patrolling officers, including Michaud, repaired to the scene. They were unable to locate Austin.

Around 2:50 a.m., the same two officers responded to a call advising that Austin had returned to 26 Knox Street and was trying to gain access to his ex-girlfriend's apartment. The officers found Austin, visibly agitated, on the sidewalk in front of the apartment complex. They gave him both a disorderly conduct warning and a criminal trespass warning.

About fifteen minutes later, Officer Michaud spotted Austin (still visibly agitated) in a park several blocks from Knox Street. By virtue of a municipal ordinance, the park was closed during the early morning hours. At 3:05 a.m., Officer Michaud issued a civil citation to Austin for violating that ordinance. In this citation, he described Austin as a 33-year-old black male, standing five feet seven inches tall and weighing 190 pounds.

At 3:21 a.m., two squad cars — one driven by Officer Michaud and one by Officer Maillet — responded to an unrelated call on Main Street. Like Officer Michaud, Officer Maillet had been told upon beginning his shift about the ruckus at Knox Street. During his shift, he also overheard radio traffic concerning 26 Knox Street. His curiosity piqued, he questioned Officer Michaud concerning that domestic disturbance. Michaud explained that Austin had appeared to be harassing a former girlfriend. He added that he had given Austin a criminal trespass warning and sent him on his way. Michaud described Austin to Maillet somewhat

-3-

differently than he had in the criminal trespass citation: as a black male standing about six feet tall and weighing approximately 200 pounds. This description was important because Officer Maillet did not know Austin.

While the two officers were conversing, a police dispatcher reported that a man identifying himself as "Tyrone Miller" had called from a payphone to proclaim that he had killed a woman at 26 Knox Street. Both Officer Michaud and Officer Maillet assumed, based on the chain of events, that "Tyrone Miller" was Gary Austin.[1]

As might be expected, the reported slaying galvanized the two officers into action. They traveled in their separate cars to Knox Street — a drive that took approximately one minute. Officer Michaud arrived first and parked at an intersection about 200 feet from 26 Knox Street. While positioning his cruiser, he noticed a man crossing the street. The man appeared to be of average build and about five feet ten inches or six feet tall. Officer Michaud thought that this man might be Austin, but the dim lighting prevented him from making a positive identification. Taking a middle ground, he radioed that he had seen "a subject" walking out of 26 Knox Street.

---

[1] At some point that morning, a dispatcher confirmed that "Tyrone Miller" was an alias of Gary Austin's. It is unclear exactly when this broadcast occurred but, given the officers' assumption that Miller and Austin were one and the same, the precise chronology does not matter.

-4-

Officer Maillet heard this broadcast and understood his fellow officer to have said that "the suspect" was on the street. He took this comment as a reference to Austin.

As Officer Maillet proceeded down Knox Street, he spied the lone pedestrian. He noticed that the man fit the general description of Austin that he had been given minutes earlier by Officer Michaud. He did not see anyone else in the vicinity. Concluding that the man was Austin, he braked to a halt, stepped out of his squad car with his gun drawn, and ordered the man to raise his hands, get down on his knees, and then lie flat. The man complied.

Once the man was on his stomach, Officer Maillet handcuffed him and performed a pat-frisk. This protective search revealed a 9mm handgun tucked into the man's waistband. The weapon had not been visible when the officer first confronted the man.

Officer Michaud ran up while Officer Maillet was conducting the pat-down. He observed Officer Maillet remove the gun from the suspect's waistband. Officer Maillet handed the gun to Officer Michaud. It was only after those events had transpired that Officer Michaud realized that the person in handcuffs was not Austin but, rather, the appellant.

The officers arrested the appellant for possession of a concealed weapon. See Me. Rev. Stat. Ann. tit. 25, § 2001-A(1)(B) (2007). Only minutes had elapsed between the time of the "murder" dispatch and the time of the arrest.

Following the encounter, the police transported the appellant to the stationhouse and booked him. In the arrest report, the appellant is described as a 24-year-old black male of medium build, standing six feet tall and weighing 185 pounds.

When the dust settled, it became apparent both that the murder report was a hoax and that the appellant had nothing to do with the domestic dispute at 26 Knox Street. At about the time of the appellant's arrest, other officers stopped Austin some three blocks away and later charged him with making a false report of a crime. That arrest report described him as a 33-year-old black male of medium build, standing five feet eight inches tall and weighing between 160 and 180 pounds.

As matters turned out, Austin had a history of making false calls to the police department; but there is no evidence that either arresting officer knew of this history. Nor did they know, at the time of the stop, either that Austin had been apprehended or that the murder report was false. Based on these circumstances, the district court found that when Officer Maillet frisked the appellant, he believed that he was searching Austin and that Austin may have committed a murder.[2]

---

[2] The findings and conclusions in this case were made in the first instance by the magistrate judge. They were then adopted by the district judge. For ease in exposition, we take an institutional view and refer throughout to these findings and conclusions as the findings and conclusions of the district court.

-6-

When the authorities discovered that the appellant had a criminal record, a federal grand jury indicted him on a charge of being a felon in possession of a firearm. See 18 U.S.C. § 922(g)(1). The appellant moved to suppress the gun, arguing that the police had learned of it through an unlawful stop and arrest. The government opposed this motion.

The district court referred the matter to a magistrate judge, who conducted an evidentiary hearing. The magistrate judge found both the stop and the arrest lawful and recommended that the district court deny the motion to suppress. On de novo review, the district court adopted the magistrate judge's report and recommendation.

The appellant entered a conditional guilty plea, Fed. R. Crim. P. 11(a)(2), reserving the right to challenge the refusal to suppress. The court sentenced the appellant to a term of 36 months in prison. This timely appeal ensued.

## II. ANALYSIS

The appellant's asseverational array is fourfold. First, he maintains that the district court clearly erred in finding that Officer Michaud described Austin to Officer Maillet as a black male, standing six feet tall and weighing 200 pounds. Second, he argues that the stop was not justified at its inception because Officer Maillet lacked a reasonable suspicion that the appellant was involved in criminal activity. Third, he argues that the stop

was so intrusive as to constitute a de facto arrest (for which no probable cause existed). Fourth, he posits that even after finding the handgun, there was no probable cause to arrest him. Before addressing these contentions, we pause to erect the legal framework for our analysis.

Judicial review of investigatory stops, familiarly known as Terry stops, see Terry v. Ohio, 392 U.S. 1, 19-20 (1968), involves a two-step appraisal. To begin, the stop must be justified at its inception. See Ruidíaz, 529 F.3d at 28. In addition, the actions taken must be "reasonably related in scope to the circumstances which justified the interference." United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998).

To be justified at its inception, a Terry stop must be accompanied by reasonable suspicion. Ruidíaz, 529 F.3d at 28. The existence vel non of reasonable suspicion depends upon the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 273 (2002). The inquiry is designed to ascertain "whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." Id. (internal quotation marks omitted).

This appraisal is made in the first instance by the district court. The district court's findings of fact must be accepted unless they are clearly erroneous. Ornelas v. United States, 517 U.S. 690, 699 (1996). This is a deferential standard of appellate review, which requires us to "proceed circumspectly

-8-

and with regard for the district court's superior vantage point." United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007).  Only the district court's conclusions of law, including its ultimate conclusion as to whether the facts as found show reasonable suspicion, engender de novo review.  Ornelas, 517 U.S. at 699.

## A.  The Claim of Factual Error.

The appellant insists that the court premised its conclusion that Officer Maillet had a reasonable suspicion on an incorrect factual finding.  In this regard, he says that it "stretches credulity" to believe that Officers Michaud and Maillet discussed Austin at all, let alone that the former gave the latter a description of Austin that differed from the description in the criminal trespass citation. Viewed from any angle, this boils down to a claim that the district court made an insupportable credibility determination.

As we have said, a district court's factual findings may be rejected only if they are clearly erroneous.  As long as such findings are supported by a plausible view of the evidence, they will not be overturned.  Espinoza, 490 F.3d at 46.  Credibility determinations are factual findings, and especially wide latitude must be accorded to them.  See Ruidíaz, 529 F.3d at 32.

In the case at hand, it cannot be gainsaid that Officer Michaud's successive descriptions of Austin diverge from one another.  It is common ground that inconsistencies in a witness's

statements can serve as a basis for an adverse credibility determination. See, e.g., United States v. Henderson, 463 F.3d 27, 34-35, 47 (1st Cir. 2006). But a witness's statement need not be a letter-perfect replica of an earlier statement in order to be given credence. Gauging the effect of inconsistencies on a witness's credibility is, within wide limits, for the trier of fact, not for the court of appeals.

We can easily dispatch the appellant's claim that the purported conversation between Officer Michaud and Officer Maillet never took place. The record reflects that Officer Michaud cited Austin and then proceeded to Main Street at 3:21 a.m. Officer Maillet responded to that same call. The roughly eight minutes that the officers took was ample time for the officers to have dealt with the object of the call and briefly discussed Austin's troublemaking. The district court's finding that Officer Michaud gave Officer Maillet a verbal description of Austin was, therefore, not clearly erroneous.

This brings us to the appellant's claim that the description, if given at all, was not along the lines testified to by the officers. The appellant vigorously asserted the discrepancy in Officer Michaud's descriptions before the district court. The court rejected this position and found that both officers had testified truthfully as to how Officer Michaud described Austin to Officer Maillet. We see no principled basis for a claim of clear error.

The variation in the two descriptions is not particularly surprising. Guessing at a stranger's height and weight is a notoriously uncertain enterprise. Moreover, exactness in recollecting what one previously may have estimated may sometimes be too much to expect. Given the speed at which events evolved, the discrepancy here is not so damning as to justify an overriding of the trial court's credibility judgment.

### B. **Reasonable Suspicion**.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This constitutional assurance does not prohibit all searches and seizures but, rather, only those that are unreasonable. Consistent with this view, a brief investigatory stop based on a reasonable suspicion that criminal activity may be afoot does not violate the Fourth Amendment, even in the absence of probable cause. See United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry, 392 U.S. at 29-30.

In defining terms such as "reasonable suspicion," courts deliberately paint in broad strokes, eschewing overly confining language. See, e.g., Ornelas, 517 U.S. at 695-96; Sokolow, 490 U.S. at 7-8. Withal, there are some general guideposts. Prominent among these is the tenet that a finding of reasonable suspicion must be premised upon "a particularized and objective basis for

suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).

"Th[e] particularity requirement means, in effect, that such a finding must be 'grounded in specific and articulable facts.'" Espinoza, 490 F.3d at 47 (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)). The objectivity requirement dictates a focus on what a reasonable law enforcement officer in the same or similar circumstances would have thought. See id. It is against this backdrop that we turn to the district court's determination that the stop on Knox Street was justified at its inception.

The district court's determination was founded on a series of subsidiary facts. The officers were apprised upon starting their shifts that trouble had been brewing at 26 Knox Street. Thereafter, Officer Michaud personally responded to two calls and found Austin to be agitated. When the murder report surfaced, both officers were aware that Boston had called as recently as 2:50 a.m. to report ongoing harassment by Austin. With this background in mind, the officers took the report seriously and deemed it likely that Austin had placed the call. Based on these discerned facts, the district court concluded that the officers reasonably suspected Austin of involvement in a serious crime: murder.

Officer Maillet's suspicion was underpinned not only by these facts but by other facts. For one thing, the only person

walking in the vicinity of 26 Knox Street at that early hour was the appellant. For another thing, Officer Maillet heard Officer Michaud announce that he saw "a subject," which Officer Maillet heard as "the suspect" and deemed a reference to Austin. Finally, the appellant fit the general description of Austin that Officer Maillet had received.

Given this factual mosaic, we think that the district court supportably determined that Officer Maillet's stop of the appellant was accompanied by a reasonable suspicion that a crime (murder) may have been committed, that Austin may have committed it, and that the appellant was Austin. A reasonably prudent police officer standing in Maillet's shoes and knowing what Maillet knew would certainly have harbored such suspicions.

To be sure, this suspicion was predicated on two mistaken conclusions: that Officer Michaud had said "the suspect" rather than "a subject" and that the appellant was Austin. The district court found, at least implicitly, that these mistakes were objectively reasonable and made in good faith. This finding was not clearly erroneous. See, e.g., United States v. Lang, 81 F.3d 955, 965-66 (10th Cir. 1996).

Very little need be said about Officer Maillet's misunderstanding of Officer Michaud's broadcast. In the heat of the moment, it is easy to understand how a police officer might hear "a subject" as "the suspect." The circumstances do not

suggest bad faith, and the district court's acceptance of Officer Maillet's explanation is in our view unimpugnable.

This leaves the mistaken identity. The district court found an objectively reasonable basis for this mistake. It likewise found that the mistake did not undermine the reasonableness of the officer's suspicion. These findings make good sense. Because reasonable suspicion does not necessitate a high degree of certitude, there is no requirement that the facts on which it is grounded be unfailingly accurate. In carrying out a Terry stop, a police officer is not required to possess the clarity of vision that arises only in hindsight. See Illinois v. Wardlow, 528 U.S. 119, 125-26 (2000).

Undaunted by the district court's adroit marshaling of the facts, the appellant emphasizes that there was nothing suspicious about his conduct; he was simply strolling down the sidewalk at 3:30 in the morning. But the lawfulness of the conduct that Officer Maillet observed does not dispel the reasonable suspicion that underpinned the stop. In reviewing a trial court's reasonable suspicion determination, we must take care not to evaluate facts in splendid isolation. Such a balkanized approach runs an unacceptably high risk of distorting reality. See Arvizu, 534 U.S. at 274-75. Rather, we must appraise the facts in the context in which they occurred. See id.[3]

_____

[3] After this case was briefed and argued, a divided panel of this court decided United States v. Camacho, ___ F.3d ___ (1st Cir.

-14-

The appellant emphasizes other facts as well: the murder report turned out to be a hoax; Austin was arrested around the same time that Officer Maillet encountered the appellant; and a supervisor radioed for all officers responding to the murder report to "stop anybody in that area." These facts, the appellant contends, defuse any suspicion. We disagree.

We start with the "hoax" argument, which translates into an argument that no murder had been committed. The law does not require officers to determine whether a reported crime actually took place before stopping individuals who may be fleeing from the scene. See Adams v. Williams, 407 U.S. 143, 144-46 (1972). Here, the district court found, and the record supports, that Officer Maillet took the call seriously. There is no instance that he had any inkling about Austin's history of false reports. Consequently, there was no reason for him to think Austin had made a crank call.

Moving to the appellant's next point, the record shows that Austin was arrested around the same time that Officer Maillet confronted the appellant. For present purposes, however, the decisive consideration is the district court's supportable finding

2011) [No. 09-2415]. There, the majority held that officers lacked reasonable suspicion to stop an unknown person strolling down the sidewalk near a recently dispersed gang brawl. Id. at ___ [slip op. at 14-16]. Although both Camacho and this case involve individuals who were merely walking down the street when stopped, the similarity ends there. In this case, Officer Maillet had a reasonable suspicion, based on the events of the evening, to stop a specific individual (Gary Austin). The appellant was stopped because he fit the description of Austin that the officer had been given and was reasonably mistaken for Austin.

-15-

that Officer Maillet was unaware of Austin's capture.  The appellant's argument is, therefore, unavailing.

By like token, Officer Maillet had no way of knowing that there was any reason to question the parameters of Austin's described height and weight.  The relevant inquiry focuses on the facts known to the officer, actually or constructively, at the time of the incident.  See id. at 146.  That some other officer may have known something different is immaterial.

Last, the appellant harps on the supervisor's direction to all officers responding to the call to stop everyone in the area.  We need not grapple with the merits of this argument.  In this case, the record does not indicate that Officer Maillet's stop was predicated on the general dragnet order.[4]

## C. **Scope of the Stop**.

The appellant's next plaint targets the scope of the stop.  Because a Terry stop allows an individual to be seized on less than probable cause, the extent of that intrusion must be limited.  See Acosta-Colon, 157 F.3d at 14.  If police actions associated with a Terry stop are too intrusive in nature or too long in duration, those limits are exceeded.  See Hayes v. Florida, 470 U.S. 811, 815-16 (1985).

_____

[4] We note in passing that an order to stop everyone in the area is not necessarily problematic. Where, as here, the order was given at 3:30 a.m. and refers to an area in which few, if any, people are likely to be found, a dragnet approach may be constitutionally permissible. See, e.g., Edmond v. Goldsmith, 183 F.3d 659, 662-63 (7th Cir. 1999).

There is no bright line that distinguishes a valid Terry stop from its invalid counterpart (commonly known as a de facto arrest). See Florida v. Royer, 460 U.S. 491, 506-07 (1983). Sometimes, the line can be drawn by asking whether "a reasonable man in the suspect's position would have understood his situation" as being an arrest. Acosta-Colon, 157 F.3d at 14 (internal quotation marks omitted). But it is an oversimplification to suggest that every case will fall along this continuum. Terry stops must be tailored to fit the exigencies of particular situations, and the mere presence of arrest-like features is not fatal to the validity of a particular stop. The critical consideration is whether the arrest-like features can be reconciled with the limited nature of a Terry stop. See id. at 15.

Evaluating whether the scope of an investigatory stop is reasonable demands careful consideration of the totality of the circumstances. This means weighing, among other things, "the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998). Above all, an inquiring court must bear in mind that "'it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'" United States v. Taylor, 162 F.3d 12, 18 (1st Cir. 1998) (quoting Terry, 392 U.S. at 23).

The appellant stresses that he was forced to the pavement at gunpoint and handcuffed. In his view, this degree of coercion and restraint betokens a de facto arrest. We recognize the intrusiveness of the measures taken, but that is only part of the equation. Context matters; and in this case the measures taken were prophylactic and proportional to the danger associated with stopping a suspected murderer. We explain briefly.

In a world fraught with peril, officer safety must have a place at the forefront of police work. It follows logically that a pat-frisk may accompany an investigatory stop whenever an officer "has reason to believe that the suspect is armed and dangerous." Williams, 407 U.S. at 146. In cases in which the individual stopped is suspected of having just committed a murder, it is reasonable for an officer to conclude that he may be armed and dangerous. See United States v. Bullock, 510 F.3d 342, 346 (D.C. Cir. 2007). A pat-down for weapons is, therefore, warranted. See id.

In the same vein, the limits of a Terry stop are not automatically transcended by an officer's use of other prophylactic measures. When officer safety is a legitimate concern, a Terry stop appropriately may involve the application of handcuffs, see, e.g., United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (collecting cases); or effecting a stop at gunpoint, see, e.g., United States v. Jackson, 918 F.2d 236, 238 (1st Cir. 1990); or ordering a suspect to the ground, see, e.g., United States v.

-18-

Mohamed, 630 F.3d 1, 4, 6-7 (1st Cir. 2010).  In an appropriate case, such prophylactic measures can be employed in combination. See, e.g., id.

In this instance, Officer Maillet (who had over two decades on the police force) stopped a person whom he reasonably believed had committed a murder.  He had good reason to fear that the suspect was armed and dangerous.  He effectively neutralized this looming danger by drawing his weapon, ordering the appellant to get on the ground, handcuffing him, and conducting a pat-frisk. Given the seriousness and recency of the suspected crime, we conclude that the precautions taken did not transform the Terry stop into a de facto arrest.

The brevity of what transpired locks up the conclusion that the bounds of a Terry stop were not exceeded.  The appropriate length of a Terry stop is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions.  See United States v. Sharpe, 470 U.S. 675, 685-86 (1985); United States v. Meadows, 571 F.3d 131, 142 (1st Cir. 2009).  In this instance, no more than seconds passed between the stop and the discovery of the gun.  By that time, reasonable suspicion to stop the appellant for a possible murder had morphed into probable cause to arrest him for possession of a concealed weapon.  See infra Part II(D).

That ends this aspect of the matter. The stop at issue here, while intrusive, was both proportional to the occasion and brief in duration. Consequently, it was a valid <u>Terry</u> stop.

### D.  **The Arrest**.

Even though the police found a concealed weapon on his person, the appellant strives to convince us that they lacked probable cause to arrest him. We are not persuaded.

"Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." <u>United States</u> v. <u>Young</u>, 105 F.3d 1, 6 (1st Cir. 1997). Probable cause "does not require the quantum of proof necessary to convict." <u>United States</u> v. <u>Miller</u>, 589 F.2d 1117, 1128 (1st Cir. 1978).

In order lawfully to carry a concealed weapon in Maine, a person must bring himself within one of several safe harbors. <u>See</u> Me. Rev. Stat. Ann. tit. 25, § 2001-A(2). One such safe harbor exists if the carriage of a handgun is pursuant to a valid permit. <u>Id.</u>

Acquiring a permit requires the prospective permit-holder to jump through several procedural hoops. <u>See</u> <u>id.</u> § 2003. Furthermore, when a permit-holder is carrying a concealed handgun, he must have the permit on his person, and produce it upon demand to any law enforcement officer. <u>Id.</u> § 2003(11).

Here, there is no indication that the officers asked the appellant whether he had a permit. But there is also no indication that the appellant claimed to possess a permit, nor is there any evidence that one was ever issued to him.

The appellant argues that the opacity of the record favors his position. In support, he cites our decision in United States v. Lott, 870 F.2d 778 (1st Cir. 1989), in which the defendants were asked before their arrest if they had firearm permits. See id. at 780. But the fact that the officers in Lott asked whether the suspects possessed permits was not relevant to the holding in that case. See id. at 780-85.

In this type of situation, context is all-important; each case is likely to turn on its own facts. So it is here: suggesting that the officers, in the circumstances at hand, had not developed probable cause after finding a concealed weapon does violence to the sensible proposition that "probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." United States v. Vongkaysone, 434 F.3d 68, 73-74 (1st Cir. 2006) (alteration and internal quotation marks omitted). Common sense argues persuasively that if the appellant possessed a valid conceal-and-carry permit, he surely would have made that fact known.

To say more on this point would be supererogatory. In the circumstances of this case, the officer's discovery of the

-21-

concealed handgun after performing a <u>Terry</u> stop furnished probable cause for arresting the appellant.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we affirm the judgment of the district court.


**<u>Affirmed</u>**.