HOWARD, Circuit Judge,
dissenting.
In my view, the government correctly identified three critical errors of law in the district court’s order to suppress the handgun found on Dapolito’s person. Rather than correct these errors, the panel majority sidesteps the first and repeats the second and third. With great respect, I must dissent from the majority’s opinion.
Although it is our practice to defer to the district court’s factual findings and review them only for clear error, we are also obligated to perform an “independent appellate review” of the district court’s “ultimate determination[ ] of reasonable suspicion.” Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Battle, 637 F.3d 44, 48-49 (1st Cir.2011). The Supreme Court has emphasized the importance of de novo review in cases like this one for at least three reasons. First, if we deferred to the district court’s decision on reasonable suspicion — a mixed question of law and fact — we would permit the scope and force of the Fourth Amendment to vary between identical factual situations, depending on which district judge heard *154 the motion to suppress. See Ornelas, 517 U.S. at 697, 116 S.Ct. 1657 (citing Brinegar v. United States, 338 U.S. 160, 171, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Second, reasonable suspicion is a “eommonsense, nontechnical” concept that gains form “only through application,” and so de novo review is “necessary if appellate courts are to maintain control of, and to clarify, the legal principles” that define the law in this area. Id. at 695, 697, 116 S.Ct. 1657 (citing Miller v. Fenton, 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). Finally, de novo review serves to unify and rationalize past precedent, so that our Fourth Amendment jurisprudence will “provid[e] law enforcement officers with a defined ‘set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.’ ” Id. at 697-98, 116 S.Ct. 1657 (quoting New York v. Bel-ton, 453 U.S. 454, 458, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)). Therefore, while we should defer to the district court’s description of the historical record, we owe no deference to its view of the law. Instead, we have a duty to apply the law anew.
The first error in the district court’s suppression order is its conclusion that a Terry stop occurred at the moment that Dapolito produced his EBT card and still failed to allay the officers’ suspicions. United States v. Dapolito, No. 2:12-cr-00045-NT, 2012 WL 3612602 at *7 (D.Me. Aug. 21, 2012). The majority avoids this issue by assuming arguendo that no stop occurred until later, when the officers told Dapolito that they intended to take him to jail in order to identify him. But the majority opinion leaves the actual timing of the stop an open question. See ante at 147 n. 7. I believe that we can and should state with confidence that no stop occurred until later, when the officers actually attempted to arrest Dapolito.
Law enforcement agents are free to “approach!] an individual and ask[] [him] a few questions” without implicating any Fourth Amendment protections. Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Those interactions “need not find a basis in any articulable suspicion.” United States v. Young, 105 F.3d 1, 5 (1st Cir.1997). Only when an encounter escalates into a brief “investigatory stop,” also known as a “Terry stop,” see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), does the Fourth Amendment come into play. In such cases, the Fourth Amendment requires that the police have “a reasonable suspicion that criminal activity may be afoot.” United States v. Pontoo, 666 F.3d 20, 27 (1st Cir.2011). The Supreme Court has identified the moment at which a consensual encounter transforms into Terry stop as when “a reasonable person would ... believe[ ] that he [is] not free to leave,” I.N.S. v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)), and we use a totality of the circumstances inquiry to conduct that analysis, United States v. Smith, 423 F.3d 25, 29-30 (1st Cir.2005).
In this case, the district court found that the interaction between Dapolito and the police began as a consensual encounter but matured into a Terry stop “[a]fter about fifteen minutes of questioning, and after the production of the EBT card did not dispel the officers’ suspicions.” Dapolito, 2012 WL 3612602, at *7. At that point, according to the district court, “it would have been obvious to any reasonable person that the police were not going to let him go.” Id.
I find that conclusion difficult to square with the settled law in this area. The *155 district court’s opinion does not explain why or how the length of the encounter and the officers’ incredulity communicated to Dapolito that he was suddenly not allowed to walk away. According to the Supreme Court, circumstances that may indicate a Terry stop include “the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer’s request might be compelled.” Menden-hall, 446 U.S. at 554, 100 S.Ct. 1870. Here, if no Terry stop had occurred before the production of the EBT card — and, in fact, up to that moment only two officers were present, they had not drawn their weapons or touched Dapolito, and they did nothing to indicate that Dapolito was compelled to comply with their requests — then it remains a mystery to me how the encounter became a Terry stop after that point.
The district court’s order emphasizes that Dapolito was physically confined because “his egress was impaired” by the position of the two officers in front of the alcove. Dapolito, 2012 WL 3612602, at *7. However, we have urged courts to “remember[] that mere physical limitations on an individual’s movement, not created by police, are insufficient to turn an encounter with police into a restraint of liberty.” Smith, 423 F.3d at 30. That adage follows the lead of the Supreme Court, which has repeatedly declined to find a seizure when law enforcement agents block a civilian’s escape from a confined space. See Bostick, 501 U.S. at 436, 111 S.Ct. 2382, 115 L.Ed.2d 389; see also Delgado, 466 U.S. at 218-19, 104 S.Ct. 1758. Here, the officers “stood where they had to,” Smith, 423 F.3d at 30, and the fact that they had to stand at the opening of the alcove did not mean that they had seized Dapolito for Fourth Amendment purposes.
Nor did the length of the exchange up to that point, which the district court clocked at approximately 15 minutes, see Dapolito, 2012 WL 3612602, at *7, transform the encounter into a Terry stop. A totality of the circumstances analysis logically includes the duration of the encounter,[13] but we have emphasized that the “trigger point for Fourth Amendment purposes is the presence or absence of some cognizable coercion or constraint,” United States v. Espinoza, 490 F.3d 41, 48 (1st Cir.2007) (emphasis added). That formulation belies the notion that the length of a consensual encounter alone can transform it into a Terry stop. Indeed, we rejected exactly that proposition in United States v. Berry-man, 717 F.2d 650 (1st Cir.1983) (en banc), in which our circuit sitting en banc reversed a prior decision by a panel majority that had held that the “prolongation” of police questioning could create “an atmosphere of restraint” that would constitute a Terry stop.[14] United States v. Berryman, 717 F.2d 651, 656 (1st Cir.), rev’d en banc, 717 F.2d 650 (1st Cir.1983); see also United States v. Gallego-Zapata, 630 F.Supp. 665, 670 (D.Mass.1986). Regardless, in my view, the 15 minutes of questioning in this case was not so long that it escalated into a Terry stop — we have previously found that a consensual encounter lasting over 20 minutes did not amount to a restriction on *156 liberty implicating the Fourth Amendment. See, e.g., United States v. Jodoin, 672 F.2d 232, 234 (1st Cir.1982), abrogated on other grounds, Bloate v. United States, 559 U.S. 196, 130 S.Ct. 1345, 176 L.Ed.2d 54 (2010).
In any event, what should be practically decisive in this case is the fact that Dapoli-to apparently felt comfortable enough throughout the encounter that he repeatedly declined the officers’ requests to search him for identification. See Dapolito, 2012 WL 3612602, at *2 (“Officer Ray ... asked if he could pat [Dapolito] down to find identification. [Dapolito] refused, telling the officers that he did not like to be touched.”); id. (“Officer Ray asked a second time if he could search [Dapolito] for identification. [Dapolito] again refused.”); see also id. at *3 (“Officer Ray told [Dapolito] that they were taking him to the county jail to identify him ... [Da-polito] turned slightly away from the officers and said that he ‘didn’t want that.’ ”). When the suspect’s freedom of movement is restricted by factors independent of police conduct, the Supreme Court has instructed that we should modify the traditional “free to leave” inquiry and instead ask “whether a reasonable person would feel free to decline the officers’ requests or otherwise terminate the encounter.” Bostick, 501 U.S. at 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (emphasis added). Here, Da-polito obviously felt that freedom and exercised it more than once. Indeed, he rebuffed a request by the officers to search him just moments before he produced the EBT card — the point at which the district court concluded that a Terry stop took place. Although the majority steers around the issue, the law makes clear that no Terry stop had occurred at the time identified by the district court.
Were I writing the majority opinion, I would stop here, reverse the district court on this issue, and remand the case for further proceedings. If there was no Terry stop at the moment chosen by the district court, then the police were not required to have reasonable suspicion to engage with Dapolito at that point. On remand, the district court would then study the remaining chronology for any subsequent Fourth Amendment violations.
However, because the majority assumes arguendo that no Terry stop occurred until the police actually attempted to arrest Da-polito, its analysis continues onward. The majority observes that there is a serious question as to whether the detention at this later moment was merely a Terry stop or if it actually constituted a de facto arrest, ante at 153 n. 12, a greater intrusion that would have required the correspondingly greater justification of “probable cause.” See Young, 105 F.3d at 6. Nevertheless, the majority concludes that it need not answer this question because the officers did not even meet the lower requirement of reasonable suspicion needed to justify a Terry stop.
Although I expect that the government would find itself quite far from the end zone on the de facto arrest issue if the case were remanded, I am compelled to state my disagreement with the majority’s conclusion that the officers did not at least have a reasonable suspicion of criminal activity that would have justified a Terry stop. That discussion also brings me to the government’s second and third claims of error, addressed to the district court’s finding that no reasonable suspicion existed to support the brief detention of Dapoli-to. I believe that the government correctly identified two important mistakes, and that the majority reinscribes these errors in its own analysis. I also believe that both opinions reach the wrong outcome on the overall issue, since our precedent makes clear that the officers had reason *157 able suspicion to execute a Terry stop in this case.
I am persuaded by the government’s argument that the order to suppress commits a second error when it engages in an impermissible “divide-and-conquer” analysis of the facts surrounding the encounter with Dapolito. United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); see also Pontoo, 666 F.3d at 29. We use a totality of the circumstances test to determine whether reasonable suspicion existed to justify a Terry stop. This analysis requires a “broad-based consideration of all the attendant circumstances,” United States v. Chhien, 266 F.3d 1, 6 (1st Cir.2001), so that “the whole picture ... [is] taken into account,” United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It precludes courts from dismantling a claim of reasonable suspicion by picking out the suspicious factors one-by-one and offering an innocent explanation for each. United States v. McGregor, 650 F.3d 813, 822 (1st Cir.2011).
Yet that is exactly what happened here. The suppression order repeatedly excuses Dapolito’s behavior merely because it was lawful, but never considers how his weird manner could still have seemed suspicious to the police in context. See, e.g., Dapolito, 2012 WL 3612602, at *7 (‘What the officers had was an odd, grimacing, impaired man, who was unknown to them and who was not making much sense. [Dapolito] was acting not unlike many other members of the indigent and/or transient population of Portland.”); id. at *8 (“[Dapolito’s] story ... was not adding up, but ... [e]ven if the story was not truthful, the Government made no claim that such a false statement would be criminal.”). That reasoning is directly contrary to the Supreme Court’s clear instruction that “[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct.” Arvizu, 534 U.S. at 277, 122 S.Ct. 744; see also Pontoo, 666 F.3d at 29.
An even more critical mistake, in my view, is that the court’s suppression order isolates and dismisses each of the two crimes that the police officers suspected Dapolito of committing, without considering the totality of the circumstances from an objective point of view. During the encounter with Dapolito, the officers on the scene suspected either that he may have been involved in a burglary or that he might be wanted on a warrant. See Da-polito, 2012 WL 3612602, at *7. We are bound to consider these two possibilities together, rather than “in splendid isolation.” Pontoo, 666 F.3d at 29. Nor are we limited only to these two possibilities, since “[w]hether a reasonable suspicion exists is treated as an objective inquiry: the actual motive or thought process of the officer is not plumbed.” Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir.2004). Although neither the burglary nor the warrant theory was invincible on its own, we must consider them both along with all of the other possible crimes that an objective view of the circumstances would have given the police reason to suspect — for instance, that Dapolito was in possession of a controlled substance or that he was planning to rob the next person who exited or entered the apartment building. Viewed through this holistic lens, a reasonable law enforcement agent at the scene would have had good reason to believe that “criminal activity may be afoot.” Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (internal quotation marks omitted).
The third error in the order to suppress is that the district court substitutes its own judgment for that of the officers on the scene. We use “an objective inquiry ... from the perspective of the searching offi *158 cers” to evaluate whether a Terry stop was justified by reasonable suspicion. United States v. Aitoro, 446 F.3d 246, 253 (1st Cir.2006). In order to adopt the perspective of an objectively reasonable officer, we must remember that law enforcement “is not required to possess the clarity of vision that arises only in hindsight.” Pontoo, 666 F.3d at 28.
When the district court discusses how Dapolito misspelled his name, however, it substitutes its own after-the-fact perspective for what would have been apparent to the police officers on the scene. Viewing the scene through the eyes of the officers, we see a man who claims to have a Massachusetts driver’s license, but who gives a name that does not appear in either the Massachusetts or Maine motor vehicle records. See Dapolito, 2012 WL 3612602, at *2. Asked again for his name, the man spells it differently from the first time he offered it, and yet even this new spelling does not appear in either state’s database. See id. Finally, we spot an EBT card in the man’s pocket, which when produced bears the name that the man gave the second time but includes no other identifying information. See id. These facts are all that the police could have known, and yet the order to suppress downplays the officers’ suspicions on the grounds that Dapolito spelled his name “correctly” the second time, id., and that “it is more likely that [Dapolito] either unintentionally misspelled his name the first time or that [the officers] misheard him.” Id. at *8. Of course, while these facts were apparent to the district court sub specie aeternitatis, they would hardly have been evident to a cop on the beat. We must take the latter perspective when we evaluate whether the police acted reasonably.
Because I differ from the panel majority on how we should evaluate the facts of this case, I also reach a different outcome in my reasonable suspicion analysis. The way I see it, the police encountered Dapol-ito, a grimacing, apparently intoxicated, and nervous-looking man, standing alone outside at 2:39 AM in the morning, in an area where burglaries had recently occurred. He was stationed in an alcove alongside an ATM machine, waiting without any clear purpose in front of the doors to a restaurant and an apartment building. His mannerisms were weird, and much of what he said made no sense. He told the police that his name was “Daplito” and claimed that he had a Massachusetts driver’s license — he could not produce one— yet when the police searched both the Massachusetts and Maine motor vehicle databases, no such name appeared. Asked again for his name, he spelled it differently, as “Dapolito,” but again, no name turned up in the motor vehicle records. At the officers’ prodding, the man pulled an EBT card from his pocket that bore one of the names that he had given but did not have any other identifying information. The man said he lived in the apartment building behind him, but he did not have keys to the building, nor did he have a cell phone with which he could contact his roommates. When the officers pushed the buzzer to ring the apartment number where the man claimed to live, no one responded.
Certainly, the situation was ambiguous. But “the Supreme Court has stressed that a Terry stop is permitted even if ‘the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.’ ” United States v. Wright, 582 F.3d 199, 213 (1st Cir.2009) (quoting Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). In fact, “the very purpose of [a Terry stop] is to clarify ambiguous situations.” Id. (quoting 2 La-Fave et al., Criminal Procedure § 3.8(d), at 327 (3d ed. 2007)). And although there was nothing directly linking Dapolito to *159 criminal conduct, “no direct link between the suspect and the suspected criminal activity need be forged in order to achieve reasonable suspicion.” U.S. v. Ruidiaz, 529 F.3d 25, 29 (1st Cir.2008); see also Chhien, 266 F.3d at 6.
What matters here is that there was concrete cause for concern, given that Da-polito was standing by himself at a late hour in an area where there had been recent burglaries, obviously impaired, outside an apartment building where he claimed to live and yet could not access, and unable to give a straight answer on his own name. He may have been preparing to break into the building or the nearby ATM, or perhaps he was lying in wait to mug the next person who tried to enter the apartment building, or maybe he was under the influence of a controlled substance. Then again, he may just have been, as the district court suggested, one of the “many ... members of the indigent and/or transient population of Portland.” Dapolito, 2012 WL 3612602, at *7. The point is that officers needed to briefly detain Dapolito in order to find out. Even if it was more likely than not that Dapolito was merely a harmless transient, reasonable suspicion “is considerably less than proof of wrongdoing by a preponderance of the evidence ... [or] probable cause.” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The officers had a reasonable suspicion here.
Like the majority, I find that the fact patterns presented in Terry stop cases are so “multifaceted” that “one determination will seldom be a useful precedent for another.” Ornelas, 517 U.S. at 698, 116 S.Ct. 1657 (internal quotation marks omitted). But I feel obligated to cite just a few of our past decisions that presented similar fact patterns, which I believe demonstrate that the bar for reasonable suspicion has been met in this case. In Foley v. Kiely, 602 F.3d 28 (1st Cir.2010), we found that the police had reasonable suspicion to conduct a Terry stop of a man whom they encountered in a park late at night, possibly after the park had closed, in an area where crimes had been reported. Id. at 32. In United States v. Walker, 924 F.2d 1 (1st Cir.1991), we held that a Terry stop was justified when, at 2:30 AM, the officers spotted two people in the dimly lit parking lot of a lumber and construction business, standing near a trailer rig loaded with wood and a detached cab, in an area where there had been burglaries in the past. Id. at 4. Finally, in United States v. Jones, 432 F.3d 34 (1st Cir.2005), we concluded that there was reasonable suspicion for a Terry stop when the police saw two men sprinting down the street at 4:00 AM, wearing hooded sweatshirts and strange white gloves, in a neighborhood where there had been a number of robberies and break-ins, and where a third man was walking ahead of them in the same direction. Id. at 41. The facts of these cases do not perfectly align with the ones at hand, but in my opinion, they support a finding of reasonable suspicion in this case.
I respectfully dissent.

. Cf. United States v. Woodrum, 202 F.3d 1, 8 (1st Cir.2000) ("[W]hen an encounter takes some appreciable time ... the justification for the detention becomes an issue because the individual may no longer understand his participation to be voluntary.”).

. Then-Judge Breyer dissented from this conclusion in the original Berryman opinion, see Berryman, 717 F.2d at 663 (Breyer, J., dissenting), and his position was vindicated by the subsequent en banc decision.